## ASHLAND WATER CO. v. RAILROAD COMMISSION OF WISCONSIN et al.

(District Court, W. D. Wisconsin.   June 9, 1925.)

1. **Waters and water courses ⬤203(12)— Commission assumed to have considered evidence.**

In water company's suit to enjoin state Railroad Commission from interfering with its installation of proposed charges, asserted to be reasonable, though not in accordance with rates fixed by commission, it should be assumed that commission intended to and did make findings on evidence before it, and that it intended to accept the result as unimpeachable.

2. **Public service commissions ⬤7—Commission, in establishing rate base for public utility, must give evidence of reproduction costs dominant, or at least fair, consideration.**

In proceeding to establish a rate base for public utilities, evidence of reproduction costs at time of hearing must be given dominant or controlling, or at least due or substantial, reasonable, or fair consideration.

3. **Waters and water courses ⬤203(10)—Rate base fixed by commission held arbitrary, for want of consideration of cost of reproduction.**

Rate base for water company fixed by Railroad Commission, by taking reproduction costs for 10-year period, ending January 1, 1916, 8 years prior to date of hearing, and adding thereto property accretions from January, 1916, to time of hearing, *held* arbitrary, as failing to give a reasonable and fair consideration to evidence of costs of reproduction at time of hearing.

4. **Public service commissions ⬤7—Backward condition of community service does not warrant commission in refusing to fairly consider evidence of present reproduction cost in fixing rate base.**

That city served by public utility is in a stagnant or retrogressive condition and experiencing a gradual decrease in population does not justify Railroad Commission, in fixing rate base, to refuse to give at least fair and reasonable consideration to evidence of present cost of reproduction.

5. **Public service commissions ⬤7—Decision of commission, fixing rate base on inadequate valuation, cannot be sustained on theory that lower rate of return would be adequate, and would yield approximately same amount.**

Where Railroad Commission determined that public utility was entitled to 7 per cent. rate, but failed to give proper consideration to evidence of present reproduction cost in arriving at rate base, decision of commission would not be sustained on the theory that 6 per cent. would have been an adequate rate of return, and that 7 per cent. on the valuation allowed would be approximately equivalent to 6 per cent. on valuation, based on proper consideration of evidence of cost of reproduction.

Evans, Circuit Judge, dissenting.

In Equity.   Suit by the Ashland Water Company to enjoin the Railroad Commission of Wisconsin and others from interfering with plaintiff's installation of proposed charges asserted to be reasonable.   On application for temporary injunction.   Injunction granted.

Olin & Butler and R. M. Rieser, all of Madison, Wis., for Ashland Water Co.

Herman L. Ekern, Atty. Gen., and C. A. Erikson, Deputy Atty. Gen., for Railroad Commission.

Before EVANS, Circuit Judge, and GEIGER and LUSE, District Judges.

GEIGER, District Judge.   The plaintiff brought this suit to challenge the action of the defendant Railroad Commission in valuing its property, fixing schedules of rates, and the rate of return thereby exhibited.   The fundamental question concerns the valuation, as a rate base upon the utility property located in the city of Ashland.   The petition was filed before the commission on August 16, 1923.   It averred the inadequacy of the then rates to produce a reasonable return upon the fair value of the property then used and useful in the conduct of its business as a utility charged with the responsibility of furnishing water.   Upon the hearing the commission reached the conclusion that the fair value of the property as of January 1, 1924, is $605,734, to which was added the sum of $15,000 for working capital, making in the aggregate $620,734 as the rate base.   Such conclusion is stated:

"After a careful consideration of all the evidence in this case, and having in mind that the property is a going concern, we conclude that an amount equal to the reproduction cost now shown in table 1, as 'Basis A,' represents the fair value of the property, as nearly as such fair value can actually be determined.   An allowance of not to exceed

$15,000 for working capital will be required. Possibly a little less would be adequate, but the difference could not be very great. The use of $15,000 for working capital in this case makes the rate base $620,734." ·

At the threshold, the court, as were the the parties, is directed to a consideration of what is above referred to as "table 1," containing, as will be noted, what the commission characterizes "valuation summaries." For greater convenience in the discussion that must ensue, such table is here incorporated:

the complaint. Concerning the first, or Basis A, the commission says:

"The valuation shown under Basis A represents an appraisal prepared under the so-called 'split inventory' theory of valuation. Under this method, *that portion* of the property as of January 1, 1924, *which was in service on January, 1, 1916,* was valued by applying average unit prices for the ten-year period ended January 1, 1916, and the *balance* of the property was included *at* actual investment cost as shown by the company's record. To the value thus arrived at the en-

## TABLE I.

### Ashland Water Company—Valuation Summaries.

| | Ten-Year Period Ended January 1, 1916. BASIS A. | | Ten-Year Period Ended January 1, 1924. BASIS B. | | Five-Year Period Ended January 1, 1924. BASIS C. | | Spot January 1, 1924. BASIS D. | |
|---|---|---|---|---|---|---|---|---|
| | New. | Less Depreciation. | New. | Less Depreciation. | New. | Less Depreciation. | New. | Less Depreciation. |
| Land ....... | $ 7,400 | $ 7,400 | $ 7,400 | $ 7,400 | $ 7,400 | $ 7,400 | $ 6,800 | $ 6,800 |
| Transmission and distribution ....... | 299,484 | 266,832 | 502,563 | 451,470 | 607,530 | 545,632 | 541,569 | 501,763 |
| Buildings and miscellaneous structures ...... | 117,557 | 101,225 | 184,539 | 158,525 | 229,138 | 196,810 | 237,577 | 218,055 |
| Plant equipment ...... | 35,833 | 17,929 | 61,739 | 30,805 | 69,759 | 34,821 | 70,634 | 41,151 |
| General equipment ...... | 6,123 | 4,325 | 8,108 | 5,722 | 9,627 | 6,844 | 9,580 | 6,889 |
| Paving ...... | 41 | 41 | 73 | 73 | 93 | 93 | 41,052 | 38,666 |
| Subtotal.. | 466,438 | 397,752 | 764,422 | 653,995 | 923,547 | 791,600 | 907,212 | 813,324 |
| Add construction overhead ...... | 62,660* | 52,860* | 114,663* | 98,099* | 138,532* | 118,740* | 145,154** | 130,132** |
| Total .... | 529,098 | 450,612 | 879,085 | 752,094 | 1,062,079 | 910,340 | 1,052,366 | 943,456 |
| Add 15 per cent. ...... | 71,552 | 60,311 | | | | | | |
| Materials and supplies ... | 5,084 | 5,084 | 5,084 | 5,084 | 5,084 | 5,084 | 5,084 | 5,084 |
| Total .... | 605,734 | 516,007 | 884,169 | 757,178 | 1,067,163 | 915,424 | 1,057,450 | 948,540 |

*15 per cent. construction overhead to cover engineering, superintendence, interest during construction, contingencies, etc.

**16 per cent. construction overhead to cover engineering, superintendence, interest during construction, contingencies, etc.

It will be noted that these "summaries" of *values*—as is frequently found in cases of this character—disclose the development before the commission of variant hypotheses of evidence, and it is well at once to learn what the commission itself says of these hypotheses or "bases," as they are called. It is our judgment that what the commission so says is of vital importance in determining what are conceived to be the questions tendered by

gineers added an amount representing 15 per cent. of the estimated cost of the property in *service as of January 1, 1916,* as one measure of the increase in value of *that portion of the property* installed prior to January 1, 1916, to which the Ashland Water Company is entitled for the purposes of this case." (Italics supplied.)

Of Basis B the commission says:

"The valuation shown under Basis B rep-

resents an appraisal prepared by applying the average unit prices for the ten-year period ended January 1, 1924, to the inventory compiled by the commission's engineers, of physical property in service as of January 1, 1924."

Of Basis C the commission says:

"The valuation shown under Basis C was prepared in the same manner as under Basis B, except that average unit prices for the five-year period ended January 1, 1924, were used."

Of Basis D the commission says:

"The valuation shown under Basis D was prepared by applying average unit prices during the latter part of the year 1923 to an inventory compiled by Mr. Sam Wheeler of the physical property in service as of January 1, 1924."

It would seem that, excepting as the commission qualifies a separation in Basis A, the physical properties considered in the other bases were all such as were in service as of January 1, 1924; for the commission says:

"A careful consideration of the various valuations indicates that, with only two important exceptions, the differences in the values found are due to the different methods used in pricing, and not to any differences in quantities in the inventories of physical properties."

The commission also referred to the matter of book or historical costs as follows:

"In addition to the above valuations, which have a bearing upon the determination of a proper rate base, we have the testimony submitted in behalf of the city of Ashland with regard to the historical cost of the property. The records of the present company date back to September 1, 1891, at which time the books were opened with a charge of $274,-078.32 to 'construction.' Whether this represents actual investment made in the property at that date we have no definite information. We think that it is clear, however, that the cost of reproduction of the property in service *at that date* was considerably less than this amount. Since September 1, 1891, the book value of the property in plant has been increased so that as of December 21, 1924, it stands at $756,128. Of the additions of $492,049.79 thus shown, however, the city questions an amount of approximately $149,-000. The city contends, and apparently with good cause, that this amount represents excess payments made to the firm of Wheeler & Parks for services rendered by it under a contract made on October 19, 1891. The tangible services rendered by the firm have been computed by the city's representatives

to have had a value of about $40,000, and the intangible services of about $10,000, leaving the balance of the $199,000, which was paid to the company in the form of stock as being unearned."

Because of what will be later said, it may here be observed that, whether or not the last foregoing is to be treated as a finding, it discloses rather clearly the view of the commission to be this: That the book showing was brought into the case by the city—treated apparently as a party—to the end of reflecting the amount to be determined against and campared with other "summaries of values." The city, in challenging the book total, $756,-128, picked out an item—$199,000—and caused that to be reviewed, with the result of the commission's intimation that the city justly and successfully challenges $149,000 thereof. Therefore the foregoing excerpt from the commission's finding indicates pretty clearly the *range* within which book or historical costs were considered by it; that is to say, if the book showing of $756,128 is to be reduced by $149,000, it leaves a balance of $607,128—A figure *singularly coincident* with the figure, $605,734, found by the commission under its so-called Basis A.

[1] Now, it ought to be assumed upon the present motion that the commission, in developing the results of the methods or bases disclosed in its table, intended to and did make findings upon the evidence before it under the varying methods or hypotheses; and this, of course, involves and necessitates conceding to the commission the discharge of its function of weighing and giving credence to the pertinent evidence upon each hypothesis, thereby to reflect its own purpose to accept the results *as unimpeachable results;* that is to say, Basis A, up to the time of adding the 15 per cent., reflects results upon evidence dealing with a 10-year period *ending January 1, 1916;* plus the evidence from the company's records as to the actual cost of increments during the eight years following, which the commission considered unimpeachable; that likewise the results in Bases B and C, being the results of the commission's own development of evidence under the guidance of its engineers, truly reflect the consideration of unimpeachable evidence in pursuit of these methods, respectively; and whether or not Basis D was prepared by the commission, it is put forth as a finding upon evidence before it dealing with spot reproduction costs, and there is no suggestion that the commission considered either the supporting evidence *or the conclusion* as having any infirmity in reflecting true reproduction

or construction costs, *as of the date* of hearing.

We come to a brief consideration of certain adjudications whose influence in cases of this character has been the subject of widespread discussion and debate, if not dissensions. Their authority is not detracted from by noting that not only commissions, but to some extent trial courts and masters, have been reluctant to give them the effect claimed for them. In an opinion herewith filed, our associate, in approaching this phase of the matter before us, says:

"A careful reading of the three much-discussed cases, all in 262 U. S.—Southwestern Bell Telephone Co. v. Public Service Commission [262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807], Bluefield v. Public Service Commission [262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176], and Georgia Ry. v. R. R. Commission, supra [262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144]—leads to the conclusion that there was no intended conflict between the so-called Georgia Case and the Bluefield Co. Case. It is not our duty nor our privilege to attempt to stress or minimize what Justice McKenna pointed out in the dissenting opinion in the Georgia Railway Co. Case, nor to reconcile Mr. Justice Brandeis' concurrence in the Bluefield Co. Case with the views by him stated in the Southwestern Bell Telephone Co. Case.

"We conclude that, under the rule laid down by the three decisions, it was necessary for the commission, in determining value for rate-making purposes, to give consideration to present reproduction cost. Not only must the commission give consideration to it, but such factor *must find reflection* in the finding of value. In other words, it is not a compliance with this rule for the commission to merely hear evidence upon present reproduction cost and then disregard it entirely in making a finding on value. Nor can it be said that the rule is met if the commission receives evidence of reproduction cost, considers it, and allows a sum so small as to indicate clearly it was not complying with the *spirit of the rule* announced in these decisions." (Italics supplied.)

Again, after quoting from the Georgia Case, wherein it was said that the whole reproduction costs less depreciation need not be the rule, and that the commission and trial court held correctly that entire replacement cost was not the sole determiner, our associate comments:

"While this language justifies the commission in placing a value upon the property of the utility at a sum other than 'the replacement cost less depreciation,'" the court is uncertain "as to the extent which the reproduction cost should enter as a factor in determining value. In this case (evidently the case before us now) it is apparent that the commission not only received evidence on reproduction cost, but gave it due consideration. It allowed at least 15 per cent. *of the valuation in 1916* therefor."

We need not at this time consider whether the estimate above placed upon the three decisions is correct. Whether, as suggested in the Monroe Gas Co. Case (D. C.) 292 F. 139, present reproduction costs must be *dominantly* reflected in a finding, it would seem that, if the rule of the three cases was worth while promulgating, it contemplated that at least *due* or *substantial consideration* of the evidence of present reproduction costs be reflected in the finding. The rule, if of any value, does not contemplate that commissions or courts may play with percentages in such a manner that—as I propose to show in the present case—the whole situation is not only left to guesswork, but most persuasively suggests an unwillingness clearly to give *substantial, or due, or even reasonable, recognition* to the rule. Later, reference to the Supreme Court's own application of the rule will be made.

Let us now recur to the table of "valuation summaries" prepared by the commission. The four bases profess to deal with some sort of reproduction costs. With this much said, the outstanding feature upon comparison is the gross disparity between Basis A and any one and all of the other three bases. After giving credit for "construction overhead" as an element of cost, and therefore of value, the utility is credited under Basis A with $529,098, new, which, however, for some reason was caused to be depreciated to $450,612. We at once observe that under Basis B, which is the first attempt to reflect reproduction costs *during a period ending with the time of the hearing,* the figures, new, are $879,085, or almost exactly 67 per cent. in excess of the figures, new, under Basis A; whereas the depreciated figures on Basis B are $752,094, almost exactly 66 per cent. in excess of the depreciated figures under Basis A. Under Basis C—and it is important here to recall what the commission said of this as being prepared by its own engineers —the figures, new, are $1,062,079, which, when compared with the figures, new, under Basis A, reflect a difference of slightly over 100 per cent.; whereas the figures under this same Basis B, depreciated, $910,340, when compared with the figures, *depreciated,* under

Basis A, reflect a difference of almost exactly 102 per cent. Likewise, upon comparison of the figures *new,* under Basis D—which, as we have observed are not impeached either in the proceeding before the commission or before the court—we find them $1,052,366, almost exactly 99 per cent. more than the figures *new* under Basis A; whereas under the same Basis D the *depreciated* figures, $943,456, are found to be 109 per cent. in excess of the depreciated figures in Basis A.

And it is well to bear in mind that in arriving at its result, for some reason, as hereinafter noted, the commission at once took the depreciated figure under Basis A, $450,612, and, in order to get a new or some other basis, restored the depreciation and started again at figuring from the basis, "new," $529,098. The importance of this last observation is that, if comparisons are to be made at all, in order to test out whether the commission proceeded rationally, the figures *new* in any one basis should be set over against the figures *new* in the other bases. And if the *depreciated* figures under any one basis are to be considered, they are to be set over against the *depreciated* figures in the other bases.

It may be well, also, at this point to observe that, if the commission desired to pursue the course which it in fact pursued, it is hard to find any reason why it should deal with or be concerned about depreciation at all. We assume that, under familiar principles, in valuing physical properties it is a cardinal necessity that depreciation be taken into account. When, therefore, we recall that the commission had before it a showing of historical or book costs shown by the books of the utility to be $756,128, and apparently acquiesced in the criticism of an item of $149,000, which, when charged, leaves a balance of $607,128, we still have the outstanding fact that both before and after its calculations (that is by restoring the depreciation under Basis A and adding 15 per cent.) the commission found a rate base exhibiting figures lower by enormous percentages than those which could be produced by pursuing any other reproduction cost hypothesis of value—and particularly those hypotheses dealing, as we shall note, with *true reproduction cost figures*—that is, figures *related by continuity* in point of time to, or coincident with, the *date of hearing.*

Suppose we make this enlarged statement of what the commission really did: It found spot reproduction, January 1, 1924, to be, depreciated, $943,546; *undepreciated,* $1,052,366. It found, by taking such of the property as was in service January 1, 1916, as of *that* date, *plus the historical cost of accretions in the next eight years, to be,* depreciated, $450,612; undepreciated, $529,098. The differences between these, respectively, are $492,934 and $523,268. It was obliged, in law, to take cognizance of these (enormous) differences—99 per cent. on the undepreciated and 109 per cent. on the depreciated—and to give them due, substantial, or at least *reasonable* consideration in findings of value. It had to take note, also, that historical cost, as shown by the books and as claimed by the utility, is $756,128—$306,000 more than the commission's figure under Basis A. But it agreed with the criticism of a $149,000 item in the historical cost record, which being deducted leaves $607,128 to be considered as the cost showing. (In my personal view, upon the record, this may be considered either *depreciated* or *undepreciated*—at least, the commission did not disclose how it was regarded.)

At this point, having all these higher findings before it, a conclusion is thus worked out. For the lowest, $450,612, the next highest, $520,096, "new" under Basis A, is substituted. That involves nothing more or less than *ignoring the depreciation found.* Then to the $520,098, the commission says, "add 15 per cent., $71,552" (it may be noted, however, that $71,552 is 13½ per cent. of $529,098). This, when done, gives a total of $600,650, characterized, before adding $5,084 and $15,000 working capital, as reflecting neither reproduction cost nor reproduction value nor any value of its property *as of the time of hearing* but a *"split inventory"* valuation, wherein part of its property is valued as of eight years prior to the hearing, plus book cost of eight years of accretions, plus "15 per cent. of the *estimated* cost of its property in service as of January 1, 1916, as one measure of the *increase of value* of *that portion* of its property to which the Ashland Water Company *is entitled* for the purposes of this case."

With some confidence in the foregoing as correctly exhibiting the commission's course, any attempt to limit the question put up to the court to the effectiveness of the mere addition of 15 per cent. to one of four basic valuations—which one happens to be the lowest in amount—must be rejected.

On the contrary, there are implications and assumptions, in thus attempting to narrow the question, which are contrary to the contentions which the plaintiff makes at the very threshold of this case, and which are contrary to the express showing of the commis-

sion's own record. The matter of a 15 per cent. addition to the calculation initially obtained through the method disclosed in Basis A is not the whole of this case. But, dealing with the record as above analyzed, we believe these propositions, among others, are before us:

(1) That the action of the commission in *selecting* a method of developing cost reproduction figures during a 10-year period *which ended eight years before the date of hearing* is arbitrary.

(2) That the action of the commission in taking only such of the property as was in service at the end of the period so ending was arbitrary.

(3) That the action of the commission in adding to the results of its calculations as to *part* of the property on a ten-year price level cost reproduction basis, as above, the accretions thereto at actual investment during the eight ensuing years, without regard to reproduction cost value of the latter at the date of the hearing, is arbitrary.

(4) That when the commission, pursuing (1), (2), and (3), last supra, found depreciated value, $450,612, and then proceeded to take figures, "new $529,099," thus ignoring the elementary necessity of taking account of depreciation in valuations, it acted arbitrarily.

(5) That when the commission, having pursued the course indicated in (1), (2), (3), and (4), supra, added 15 per cent., it acted arbitrarily—especially as the result was left lower than the amount indicated by pursuing any other hypothesis or method which dealt with evidence showing reproduction costs at the time of hearing.

(6) That in accepting Basis A the commission acted arbitrarily, because it took no note of going concern value.

(7) The commission's rule, hereinafter discussed, respecting the consideration of reproduction cost evidence, is arbitrary, and compels—in the light of its concurrence in the "prudent investment theory"—a disparagement of that sort of evidence and its probative quality.

Before entering upon a discussion of these propositions, let us endeavor to ascertain, if we can, what was really in the commission's mind as the dominant considerations which in law should guide it in determining value. And this will be done, not with a view of attempting to overthrow or to gainsay the merit of observations made by it as pertinent to economic or other aspect of valuation of utilities. It is done, however, in the confident feeling that thereby much light

is thrown upon the presence or absence of a real purpose to give effect to a rule of law with which we are dealing, howsoever that rule may be stated. And I am willing to undertake this upon the statement of the rule above given; for it is purposed, as indicated, to demonstrate that, when judged in the light of findings on a true, and not a pseudo, reproduction hypothesis, the finding made does not reflect *dominant*, nor *substantial*, nor even *fair*, consideration of either unimpeached evidence or the commission's own unimpeached findings on true reproduction costs. In its report herein the commission says:

"In considering the determination of the fair value of the applicant's property we are mindful of the fact that the courts hold that the property must be valued as a going concern, and that consideration must be to the cost of reproduction under present day prices. The position of the commission regarding this element in the determination is set forth in our decision of May 28, 1923, in the case of the Duluth Street Railway Company's application for a revaluation of its street railway properties. 27 W. R. R. ——. In order that we may not need to review the matter in this case, we refer to that decision under the heading 'Cost of Reproduction at Current Prices.'"

We note here that, of the three cases in the United States Supreme Court, Southwestern Bell Telephone was decided May 21, one week before, Bluefield and Georgia Railway & Power both on June 11, 1923, two weeks after, the Duluth matter above referred to.

[2] Now of these Supreme Court cases this may be said: That coming as they did at the end of a decade of enormous advance —of costs—they have been accepted by the bench and bar as enunciating a definite change in the pre-existing *rules for the consideration of evidence* bearing pertinently upon *valuation* of utility properties. They do not pretend to announce (1) that current reproduction costs must be respected as the sole determiner of value; nor (2) that triers of valuation issues have *the right* (which they may exercise or not *at their option*) to take such evidence into consideration. If either such were their purport, then the former would have left the commission here without a defense, and the latter the plaintiff without a case. But what is announced is this: That dominant or controlling—or, in any event, due, or substantial, reasonable, or fair—consideration *must* be given to the evidence of reproduction costs at the time of

hearing. Whatever debate may be indulged respecting the adjective to be imported into the rule deducible from the decisions, it seems difficult to escape the conclusion reached in the Monroe Gas Case (D. C.) 292 F. 139, that *dominant* consideration must be given; that such is the "necessary implication" found in the *results* in those cases. This, however, will be referred to later.

Recurring, now, to the commission's reference to the Duluth case as exhibiting its views upon "reproduction costs," we find this in its opinion therein:

"We are not commanded by the courts, as we understand it, to give either sole or preponderating weight to the cost of reproduction at present day prices. Neither do we understand that, in considering the cost of reproduction at present-day prices, we are restricted to the prices prevailing at the actual date of figuring, but that we may deal rather with general levels of prices over a period *substantially similar to that of the date of inquiry."* (Italics supplied.)

And it proceeds:

"While we recognize that the cost of reproduction at present-day prices is an element which must be given consideration in fixing value, we do not believe that that element should be controlling in the matter of valuation, nor of foremost importance."

An exhaustive discussion then develops upon the subject of reproduction cost evidence. Its legal and economic infirmities, in competitive and noncompetitive or *regulated* business, its injustice, if respected, to the public at one time (if prices are high), or to investors, such as shareholders, at another time (if prices are low), is pointed out. Much stress is laid upon the fact—said to be within cognizance as common observation or experience—that businesses prosper during a time of low, and lag during a time of high, reproduction commodity and operating prices. Much is said about "stabilization" of "investment" values, to insure the presence and sure flow of capital, and it is observed:

"Aside from the question of whether the value of a public utility property actually increases or decreases as changes in price levels occur, or in some more or less definite ratio to such changes, *we do not believe that fair treatment to the investor requires that rates should be based upon such valuations."* (Italics supplied.)

And:

"With a proper structure it is difficult to conceive of a situation where it would be necessary *to inflate* or *deflate* the *value* of a utility company's property, in accordance with changes in price levels, in order properly to compensate capital for the risks incurred by it or for its use in the industry. We have already observed that the bondholder and the preferred stockholder get no speculative benefit from such procedure. We do not believe that *fair treatment* of the common stockholder requires that he should either reap the benefits of *speculation* or suffer the losses. If upon *reasonable, legitimate, and prudent investment* the utility were allowed to earn such amounts as required to make the business *attractive to capital,* the very *fact of availability* of capital for investment in the business, *would seem to be evidence* that it was *securing a* fair return." (Italics supplied.)

And obviously the foregoing justified the commission's further statement:

"If we are to assume that the normal price level for the future is to remain at something like the present level, the *reflection* of that price level in the valuation of properties where the investment *was made at lower* prices will mean, not only that the money which has been put in by the common stockholder will earn its fair return, but it will multiply and earn *a fair return upon* the *increased amount."* (Italics supplied.)

Again:

"What justification is there, *except possibly* in economic *theory,* for requiring the customers to pay to the common stockholders a return, not only upon the property *actually* represented by the stockholder's equity, but upon the increased cost of reproduction of all the property regardless *of how it was financed."* (Italics supplied.)

And again:

"On the other hand, if the investor knows that *very material* weight is to be given to *actual investment reasonably and prudently made,* and only a position of *lesser importance* assigned to cost of reproduction at present prices, he has *to that extent* an assurance that the *element of speculation* is to be eliminated, and with it the assurance that the return upon his capital, although not as great as the *possible return in speculative* business, is almost certain to be more secure. (Italics supplied.)

These excerpts, by the commission's reference to its opinion in the Duluth matter, exhibit its unreserved acceptance of the so-called "prudent investment" theory of valuation. I say *unreserved,* because the commission says so; it says that the pres-

ence and consideration of reproduction cost evidence in valuing utilities is without justification. Whatever it says about evidence of "reproduction costs at current prices," it takes care to formulate an express rule requiring it *in law* to *disparage* such evidence, to "assign it to a position of *lesser* importance," when cast over against "prudent investment" showing—the latter to be given *"very* great weight." And, as it will be attempted to demonstrate, when the commission adopted that as its *dominant* and binding guide, the methods pursued and the results attained *defied the rule binding it, and us,* no matter whether, under that rule, reproduction cost evidence as of the time of inquiry requires, dominant, controlling, substantial, due, or only *reasonable,* or fair, consideration.

[3] With the exposition of what the commission did and said relative to the facts and the governing rules of law in the matter before it, let us take up the questions heretofore stated as the ones conceived to be put up to the court. What must be said of a rate base—of value—sought initially to be ascertained by taking reproduction costs of commodities shown in figures of a ten-year period ending eight years prior to the date of an investigation or hearing? Or, putting it more broadly, what is to be said of Basis A? To say that it exemplifies the so-called "split inventory method of valuation," it may be suggested, does not give a very satisfactory answer. The outstanding features, as applied here, are:

(a) The commission sought primarily to discover evidence of value in a price level period ending eight years before the hearing; that is, it began with January 1, 1906, and ended with January 1, 1916, and that with respect to a utility nearing the thirty-fifth year of its existence. (b) It took for such evidentiary development only such part of the property as was in use January 1, 1916. (c) To a sum thus ascertained it added the property accretions from January, 1916, to January 1, 1924, at their *book, or historical,* costs. The results, "New, $529,098," "Less depreciation, $450,612," suggest most persuasively that they must have embarrassed the commission at the outset in any effort to "deal," as it said it might, "with general level of prices over a period *substantially similar to that of the date of inquiry."* This is said in view of the results developed under Bases B, C, and D, in which the comparable figures, respectively, are 67, 99, and 109 per cent. higher, and

therefore, of themselves, forbade viewing the period 1906 to 1916, under Basis A, as "substantially similar to that of the *date* of inquiry."

But, in analyzing this "split inventory" method or basis, it must be borne in mind that apparently it involves two steps, at least, which are repugnant to any hypothesis of reproduction cost evidence, which is *tied up,* so to speak, *to the date of inquiry.* The first is taking only part of the property, and developing the evidence of its reproduction cost at the end of a period, fixed by mere *selection,* anterior to the date of inquiry. Secondly, taking the accretions coming to the utility subsequently to the period thus fixed, at book or historical cost, or possibly on some other basis. That was done here. It will not be contended, once it is desired to apply this "method," that there inheres in it any rule of reason binding a tribunal to select *one* rather than another "splitting" point in the life, or in the "inventory," of a utility to be valued. And obviously, as that point must be remote, more or less, from the date of hearing, the *range of selection* of periods may be exactly the number of years of utility's life, anterior to the "splitting point"; that is to say, when the commission here fixed January 1, 1916, as the "splitting point," and, assuming that the utility's age was thirty-four, it selected one out of 26 such periods, *all* possible to be considered *as being 8 years or more anterior to the date of hearing.* And, as noted, *selection of the point,* of itself, *excluded* from the application of the method all evidence of reproduction costs both prior and subsequent to the selected period, and necessarily "current prices" at *the date of the hearing.* And, of course, the commission in fact included, in pursuing this "split" method, accretions during the eight years from June 1, 1916, in total disregard of their cost of reproduction as of January 1, 1924.

Of course, it is appreciated that a tribunal, in determining an issue of value, may have recourse to a variety of so-called methods or calculations. And in a sense the pursuit of any one, or in fact all, methods may be said to be arbitrary; and that is particularly true when it must be recognized that no one method can be accepted or adopted as furnishing a true and sole determiner. But the evidentiary status and probative quality of reproduction costs rest in the thought that, if at any particular time value must be ascertained, it is prudent to in-

quire what the thing *costs* at *that* time—the assumption being that a buyer or seller alike look to prices asked and prices paid as embodying *their* conceptions of value. Hence, such evidence in valuing a utility is immediately disparaged when disassociated from the time of hearing—from the time *as of which* value must be determined. In the light of this, no one would pretend that a so-called "split inventory" method of valuation as was pursued in this case naturally or reasonably reflects *a more relevant basis*, either as a starting point or as a method complete in itself, than other methods, called, for example, book or historical costs, prudent investment, spot reproduction, or price level production cost methods, when each and all of those are limited to or related historically, or by other methods having continuity or relationship *to or with the time of hearing*.

Therefore, even within the limited range of this query, it may be pertinently asked: What justification or possibility of reconcilement can there be in seeking as a starting point a result wholly detached, both in respect of prices and property included, from the date of inquiry? We are content to answer this question by saying that there is none; that the method, as such, is arbitrary, and must remain so, unless and until something has been done which will harmonize the results *reasonably* with the *fair* interpretation of the reproduction cost evidence as of the time of hearing. What must be said of the act of the commission in at once ignoring its depreciated figure under Basis A, $450,612, and at once recurring to its higher undepreciated figure under the same basis, $529,098? As heretofore indicated, depreciation, even though the failure to recognize it may be helpful to a utility, *on paper*, the *fact* of depreciation in valuation proceedings cannot be ordinarily ignored; and, if it is ignored, good reasons should be forthcoming.

The next query is: Why add 15 per cent. to the *undepreciated* figures? In answering these queries, we are not concerned merely with trying to find out why a particular step was taken, but to inquire whether the final result, accomplished by taking arbitrary or capricious steps, is, when judged in the light of all other *unimpeached evidence* in the case, arbitrary or capricious. To my mind, the sure indices of arbitrariness and capriciousness are found, first, in the undisputed testimony dealing with book or historical costs, whether that testimony call

for a finding of $607,000 or $756,000; and, secondly, in each and all of the results obtained in Bases B, C, and D. It has heretofore been intimated that when, under Basis A, the commission was able to get the strikingly low figure of approximately $450,000, that result at the outset challenged attention, because of its gross disparity with results obtainable upon every other hypothesis of evidence, either as shown by the record or by the commission's formal findings. May it now be said that the commission, having, through what has been characterized a pseudo method, reached a result probably as low as any that could have been developed under any "split inventory" valuation, could then proceed upon the theory that every dollar which it added to that result *reflected* a part of Bases B, C, or D? Or was the commission compelled to take cognizance of the fact that book costs, $607,000 or $756,000, likewise *reasonably* indicated a starting point, the differences between which and Bases B, C, and D must also be *considered and reflected, reasonably* at least. Manifestly, if a commission has in mind high reproduction costs developed upon evidence and regarded as unimpeachable by it, may then, in the method indicated, find some period of years *remote* from the *date of inquiry* in which reproduction costs are one-third of what they are at the date of inquiry, and then proceed to amend them, so that they may fit into an historical cost or "prudent investment" figure, all possibility of judicial review is frustrated.

Therefore this record before us shows this in essence: The fortuitous result of $450,-612 was first amended by restoring depreciation. Then 13½ per cent. was added. The result, though still less than, appears to have come surprisingly close to, the book value indicated after deducting an item criticized. Therefore it is now said that, by taking account of the difference between $450,612 and $600,000, the commission took cognizance of the evidence supportive of its conclusions in Bases B, C, and D, although the last named, upon an undepreciated basis, is 99, and upon a depreciated basis 109, per cent. more than the respective results under Basis A. It seems idle to claim that, when the arbitrary method pursued under Basis A is enlarged in its results, as has been indicated, the circumstance that the enlarged result coincides almost to a dollar with book costs, should be treated as wholly accidental and fortuitous, yet fully satisfying any claim that the plaintiff may

make for consideration and reflection of the enormous disparity between *that* result and true reproduction cost evidence and a true reproduction cost finding, unimpeached, as *of the date* of hearing.

Let us subject this question respecting the quality of the commission's consideration of unimpeached evidence and its own finding to a further test: Suppose Basis A, its supporting evidence, and the findings, $529,098 and $450,612 "new" and "depreciated," respectively, were out of the case. That is a fair supposition, because so-called Basis A is the commission's own creature; and no one would pretend that that method must be brought into a valuation case as a sort of sine qua non, to enable rational and reasonable consideration of other evidence. In other words, when the commission had before it (1) book or historical costs, either $607,-000 plus, or $749,000 plus, and (2) reproduction costs January 1, 1924, $948,000 depreciated (Basis D), reproduction costs five years, 1919 to 1924, $910,340 (Basis C), ten-year reproduction costs, 1914 to 1924, $752,-094 (Basis B), and also had before it all pertinent evidence to support "prudent investment" *value*—personally I believe the commission had in mind approximately $600,000 as reflecting this—it is repeated, when this was the evidentiary situation before the commission, and it is the situation here, was or is there anything that suggests necessary resort to Basis A as the *one* means, rationally and fairly to solve the problem of value presented? Was or is there anything tending to balk the inquiry, unless and until resort is made to some *method*—applied to a period remote from the hearing—which, fortuitously or designedly, might develop *lower* figures? Therefore, upon the supposition above, the commission having evidence leading it to make the reproduction cost findings, B, C, D, all enormously in excess of the plainly suggested findings on "book or historical costs" and "prudent investment" value, would any one contend that by finding $605,000, a figure almost coincidental with historical cost, the commission gave *any* consideration to the spot reproduction figures, $1,052,366, or $943,456— that the finding respected a dollar of the disparity?

Now, if it be true, and it is, that reproduction costs cannot be made the *sole determiner* of value; if it be *debatable*, and it may be so regarded, whether tribunals must give *dominant* or *controlling* consideration to evidence of reproduction costs—

then this also must be true: That tribunals (commissions or courts) cannot frame rules binding themselves to a *dominant* or *controlling disparagement* of such evidence. That is what the commission did in this case when it invoked its opinion in the Duluth Case as exhibiting the rule governing the consideration of reproduction cost evidence. It announced its purpose to "give *very* great weight" to evidence pertinent to reasonable and prudent investment value, and "assign" the other "to a position of lesser importance." And it may be noted that by its terms the purpose, as expressed, carried with it illimitable discretion to determine what, as to the one, shall be "very great," and as to the other, "of lesser, importance." And when Basis A was erected, finding a price level valuation for part of the property at a period eight years remote from the date of hearing, and developing the surprising figure of $450,000, low, even as against *actual historical* cost, it became very easy to "assign" to the high figures of January 1, 1924, a position of "lesser importance." An evidentiary situation had been arbitrarily created, in order to *qualify*, so to speak, or to enforce, an arbitrary rule for the consideration of evidence.

The rule on its face—and the record in this case shows that the commission gave such recognition to it—is aimed dominantly to support a so-called "prudent investment" theory of value, and its vice rests in this: That by its express terms, no matter what the merit of the prudent investment theory of value may be, it runs counter to, or optionally may be used to displace, the rule binding tribunals to give at least *reasonable* consideration to reproduction cost evidence.

But, as has been intimated, the commission gave no consideration to reproduction cost evidence, nor to its findings, as exhibited in Bases B, C, and D of its table. It did not even attempt to consider what, if any, per cent. of either or any it would add to its initial base of $450,612 developed under Basis A. It took the latter, which reflected nothing in the way of reproduction costs *at the time of hearing*, restored the depreciation, and then added 13 per cent. The latter, however, *is only approximately 7 per cent. of what is shown by the evidence as* spot reproduction costs January 1, 1924. And, looking at it in this way, it may be readily conceded that the commission successfully "assigned" evidence of reproduction costs at the time of hearing to a "position of lesser importance."

Nothing has been said respecting another phase of the commission's development of its finding, viz.: It took no account whatever of a very substantial conceded item, exhibiting going concern value. Plainly, the item cannot be included in the rate base of $620,000, unless we ascribe to the commission an intention to treat it as covered by (a) restoration of the depreciation, or (b) as included within the so-called 15 per cent. The commission's own record negatives any such intention. If it were true, then, of course, it would demonstrate that, excepting the sum of approximately $12,000, no part of the found rate base can be ascribed to any difference between $450,000 and $948,000, and, of course, there can be no suggestion that the commission considered the latter. So there is no basis for even a suggestion that the rate base of $620,000 reflects any sort of consideration of the reproduction cost evidence as of the time of hearing. If the case were stated narrowly as attempted, viz. whether the addition of 15 per cent. shows compliance with the rule, the clear showing is that the commission proceeded arbitrarily to cast the 15 per cent. upon a sum which of itself expressly negatived the inclusion of evidence dealing with the time of hearing. Would any one say, if the commission had found $607,000 to be the depreciated or the undepreciated book or historical cost, it would be giving fair and just consideration to the evidence showing reproduction costs by adding to book or historical costs 6 or 7 per cent. of $950,000 or $1,052,000?

This whole matter may be tested in another, a purely practical, way: Suppose everything which is before the court were required to be submitted to a jury under a binding instruction covering the consideration which it must give to the evidence of reproduction costs at the time of hearing. We ought to assume that the jury, in respecting such an instruction, would recognize that it was not obliged to take the lowest nor the highest figures. And in testing out the quality of what the commission actually did, it is proper to consider the manner in which jurors, in conscientious discharge of their duty, probably would approach and determine the question. This, of course, assumes that jurors ought to perceive at once that Basis A has the arbitrary characteristics above noted, and develops evidence which of itself is not within the terms of the fundamental rule requiring value to be found as of the time of hearing. It is respectfully suggested that, as a matter of likelihood in the due consideration of the evidence, the jury would resort to processes of "averaging." If this were done, they would develop the following schedules or summaries:

| | | |
|---|---|---:|
| (1) | Basis A depreciated .......... | $450,612 |
| | Basis A new ................ | 529,098 |
| | Basis B depreciated .......... | 752,094 |
| | Basis B new ................ | 879,082 |
| | Basis C depreciated .......... | 910,340 |
| | Basis C new................: | 1,062,079 |
| | Basis D depreciated .......... | 943,456 |
| | Basis D new ................ | 1,052,366 |
| | Book costs ................. | 607,000 |
| | Prudent investment value ..... | 605,000 |
| | Total ...................... | $7,991,644 |

One-tenth of this sum is $799,000 plus.

If in pursuing such suggested method, the jury saw fit to eliminate both historical costs and prudent investment, the total would be $6,679,640, one-eighth of which is $835,000 plus. These figures are referred to because of their striking illustration of the effect which even an "averaging" method will have upon the persuasiveness of the commission's initial finding of $450,000 under Basis A. It is impossible to conceive that if, notwithstanding the foregoing possibilities, a jury would return a verdict embodying the finding made by the commission in this case, the trial judge could feel that *just* and *fair* consideration had been given to the evidence. On the other hand, supposing the jury by its verdict should disclose that it had done the very thing which the commission did in this case, would the trial judge feel that his instructions requiring *reasonable* consideration of evidence of reproduction costs at the time of hearing had been respected?

[4] This discussion of the matter necessitates a reference to other suggestions now made for upholding the commission's action: First, by a consideration of the alleged stagnant or retrogressive condition of the city of Ashland, the gradual decrease of its population, etc.; second, by practically impugning the finding of the commission, *both* with respect to the *base* and the *rate of fair return* to which it is entitled, through a finding *now to be made by this court* that, contrary to the commission's estimate of 7 or 7½ per cent. as a fair return upon value, 6 per cent. is adequate. Hence, by capitalizing the income likely to be developed under the challenged schedule of rates at 6 per cent. a rate base of $750,000 approximately may be produced; third, rates in other cities.

Of the first, it may be observed that the commission apparently was not influenced, or at least was not moved, to regard this

of sufficient consequence to carry it into a finding of fact having a persuasive influence in determining value. The matter appears first to have been pressed upon the motion before this court, but even there the degree to which the parties had considered it as available and pertinent was well illustrated by the inability of the parties to answer a query from the bench as to the present population of Ashland. The city attorney of Ashland happened to be present in the courtroom and answered.

This contention, apparently now made in seriousness for the first time, so far as it has substantial influence upon any testimony, receives cognizance in the opinion herewith filed by our associate, thus:

"There were unusual circumstances which might have justified, and perhaps required, the commission to minimize the effect of the testimony showing reproduction cost. I think this evidence was sufficient to *justify the commission* in refusing" to make *any allowance whatever "for present reproduction cost*. Not only had there been a valuation fixed by the commission and used as the rate-making base for ten years, but the company's books also showed a valuation very much less than present reproduction cost. * * * Moreover, the conditions existing in Ashland were exceptional and abnormal. The waterworks plant was originally constructed on the theory that Ashland was about to enjoy a boom and shortly become a city of perhaps 30,000 people. Instead of realizing this expectation, the state and national census shows the city's population is constantly decreasing. From the affidavits presented" to the court on this motion "it appears that many industries have withdrawn from the city, that plants had closed, that there was little market for property, that rentals had dropped, and that, when sales were made, the prices realized *were far below reproduction cost*." (Italics supplied.)

After discussing the effect of augmented rates, it is further said:

"Present reproduction cost *cannot be the determining factor* in valuation, if the base thus established becomes so high that the rates necessarily charged to produce a reasonable return are prohibitive or destructive."

Again:

"The embarrassment which courts will express in applying any hard and fast rule is apparent. For example, if the present reproduction cost is taken as the *sole factor* in determining value, and we should find

that the plaintiff is entitled to a reasonable return on $1,000,000, the present rate should be trebled, instead of doubled. In other words, the plaintiff was too modest to ask for a rate that its figures showed it was entitled to receive, if present reproduction cost was the sole factor in determining value. It asked merely for a valuation of $800,000, whereas, under its Basis D plus good will, it was entitled to a valuation of $1,000,000. And if these results be not sufficiently startling in their nature, let the possibility of future depopulation of Ashland be considered. If the depopulation which has been going on for 30 years should increase—if one-half of the present population should leave—the rates would be enormously increased. And, if the rule be an unvarying one, we can continue the speculation until a condition would exist where the utility actually drove the citizens from the city."

The foregoing excerpts seem wholly aside the question before us, in that it is expressly assumed that the court or a commission may be asked to regard present reproduction cost as a *sole* factor or determiner. No court recognizes such assumptions; indeed, they are contrary to the estimate which our associate's opinion itself places upon the Supreme Court decision. But the suggestion that apprehension growing out of a decrease of population is sufficient to justify a court in utterly ignoring a rule requiring *due* or *reasonable* consideration to be given to evidence of reproduction cost challenges attention, when once we consider its effect upon judicial duty. Plainly, it suggests that commissions and courts may broadly divide communities having utilities into at least three classes: Those which are "live" and "progressive"; those which are "stable" or "standard"; those which are "stagnant" or "retrogressive" in respect of population. And if this phase is of the importance sought to be given it in this case, of course it must lead to a discharge of duty both with respect to values, and to utility rates which afford return upon "fair" values (in a constitutional sense), which will square with that fundamental idea. The circumstance of progressive increase of population of *itself* must entitle a utility in a rich and progressive community to relatively higher rates, the second class will be entitled to receive only a sort of "standard" rate or consideration, while the utility in a stagnant community, no matter what the cost of its property, must bow to a retrogressive rate—that is, "relatively" retrogressive.

It would seem to approach the ludicrous to put these considerations forward as a basis for ignoring wholly reproduction cost evidence, and yet, at the same time, allow a commission or a court to consider seriously property in a stagnant community on the basis of *reasonably prudent investment value*. It amounts in substance to this: That not only with respect to reproduction cost evidence, but with respect to evidence bearing pertinently upon any other rule or theory of value, commissions and courts are always endowed with a power, if the community may be characterized loosely as stagnant or retrogressive, to decree that the utility entitled to have its property valued shall have *dying* values and *dying* rates. It suffices to note that the commission never saw fit to develop the case along this line, and, if it had, the views above sought to be elaborated are equally tenable against any possible plan or scheme of valuation, and, of course, destroy the rule which the plaintiff here can invoke, namely, that *reasonable consideration* must be given to reproduction cost evidence.

[5] Respecting the second above as an avenue which may lead to upholding the commission's action, that, too, is sought to be given cognizance in the opinion of our associate, thus:

: "We hold that a return of 6 per cent. is not confiscatory under the circumstances existing in the city of Ashland, where interest upon *invested capital, particularly real estate,* is low. The commission endeavored to fix a rate which would return 7½ per cent. upon the valuation. Our holding that a return of 6 per cent. *does not constitute confiscation* necessarily permits of a *considerable* difference in the base, the valuation of the property. In an equation where the *product* is *fixed,* the multiplicand will vary necessarily as the multiplier varies." (Italics supplied.)

Now, the commission found a rate base of $620,734. That, though the commission's report does not show it, may have been influenced by apprehensions respecting population, or by the fact, now above adverted to, that at Ashland "interest on invested capital, particularly real estate, is low." Yet the defendant is here insisting upon affirmance of that finding because it exhibits full "compliance" with the rule governing valuations; i. e., giving due or reasonable consideration to reproduction costs. But the commission, in further aiming to discharge its duty on the matter of a *reasonable* rate on a fair valuation, found:

"After considering the *conditions which exist* in Ashland, the hazards of the business, and the *other elements* that affect the determination of a reasonable rate of return, we conclude that the company *should be allowed* a return of 7 per cent."

Did the commission fix 7 per cent., rather than 5 per cent. or 6 per cent.? Or rather than 8 per cent. or 9 per cent.? We do not know. This, however, it finds: That conditions existing at Ashland, hazards of the business and "other elements" entitled plaintiff to a 7 per cent. return *on a just and fair valuation.* How unjust it would be when, in this court, the rate base found being either overthrown or seriously impugned, to turn the plaintiff out with the observation that, "where the product is fixed, the *multiplicand* will vary necessarily as the multiplier varies;" that 7 per cent. on $620,000 and 6 per cent. on $750,000 are nearly the same! As well might the court say that the established schedules will produce 4 per cent. on $1,050,000, the full reproduction cost. As well might the commission have said in the first instance that $450,000 (depreciated Basis A) is a fair rate base, but that, because of "conditions at Ashland," "hazards," etc., the utility is entitled to a *12 per cent. return,* even though there is a depopulating tendency, even though *"interest rates"* at Ashland, on "prudent investment," but "particularly real estate," are *low.* If, as is true, reducing the rate from 7 to 6 per cent. makes, as observed above, "a *considerable difference* in the *base,* the *valuation of the property,"* why did not the commission *directly* proceed to fix the base at $750,000, instead of $600,000? And, pursuing this thought, when it is now suggested that $600,000, by this sort of indirection, be increased to $750,000 (but only as a matter of varying multiplier and multiplicand equally), it seems rather trying to find reconcilement for the action of the commission (and of this court if defendant should prevail) in viewing the sum, $71,000—7 per cent. on $1,050,000 reproduction cost in 1924—as reflecting a "considerable" addition to the $450,000 base developed under A. Plainly, the suggestion of thus overthrowing the commission's finding of a 7 per cent. *rate* is put forward as a remedy for its error with respect to the *base,* and, if indulged, a mere paradox is erected, whereby the court would add its own arbitrary and capricious action in one respect to that of the commission in the other.

There is this fundamental aspect of these last two suggestions: Each by conclusive implication assumes that, unless the suggestions are tenable, then upon this record the commission has erred. Neither suggestion is *relevant to the rules* governing the consideration of reproduction cost evidence. But each is put forward as a means (1) of entirely superseding the rule; or (2) declaring its violation—but *with no change of result.* If courts may thus deal with contentions of parties claiming to be aggrieved, it might be well at once to accord to commissions not only plenary, but *final,* power. No matter how grievous the errors and results in Basis A, the remedy is found in reducing 7 per cent. to 6 per cent. and thereby, by indirection, raising $620,000 to $750,000, in *that manner* to bring about a reflection of *due* and *fair consideration* of reproduction costs. Or, if the plaintiff insist upon $800,000 as a fair rate base, then adjudge approximately 5 or 5½ per cent. as a fair rate of return!

We pass the reference to a comparison of water rates in Ashland and those in other cities with this comment: It seems not to be disclosed by the commission as worthy of, nor as receiving, consideration. On the hearing of this motion it was brought to the court's attention. Of course, it proceeds upon the same conclusive implications as to how the commission's findings upon the evidence must be otherwise characterized. Surely, when a commission develops a wealth of evidence and then fails to take note of a mere generality gleaned from situations not before it for comparison in *other vital respects,* the wholly collateral character of this suggestion *as evidentiary* is appreciated. Each utility in each community is entitled to a valuation upon evidence legally pertinent to its property; not merely, in difficult cases, to a referendum to other cities. There can be no need of rules or principles guiding commissions in valuations of property, if such considerations may dominate *evidence* of value in the particular case.

This discussion necessitates reference to two decisions of the Supreme Court of the United States, announced since the argument herein. The first is Ohio Utilities Co. v. Public Utilities Commission of Ohio (March 2, 1925) 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656. The case did not present large figures nor great disparity between findings and evidence, at least not in final results. There, as here, the commission "made an itemized inventory and valuation of the company's property, based on reproduction value less depreciation," resulting in $154,655.33. But in making a final award it rejected or reduced items, such as organized expense, interest during construction periods, cost of coal, and annual operating expenses. The total rejection and reductions were $9,600.25. The commission's final award of $145,055 was affirmed by the Ohio Supreme Court. On writ of error, despite the small differences arising through deductions or rejections—a trifle over 6 per cent. of the total—the Supreme Court (United States) concluded that: "From the foregoing, it is evident that the state Supreme Court did not accord to the plaintiff in error that *sort of judicial inquiry* to which under the decisions of this court it was entitled. Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176." The action of the commission, there being nothing to impeach or disparage the evidence before it in making rejections or reductions, is variously characterized by the court, "arbitrary" as to one, "without justification" as to another, and "equally capricious" as to a third.

Standard Oil Co. v. Southern Pacific Co., 45 S. Ct. 465, 69 L. Ed. ——, was decided April 20, 1925. The steamer Proteus was lost in a collision August 19, 1918, and her value at the date of disaster became an issue in proceedings to limit the liability of the other vessel. A master to whom the issue was referred found $750,000, with interest. When the case came before the District Court (285 F. 617), Circuit Judge Julian W. Mack, who was presiding, after discussing the case and the pertinency of evidence dealing with the cost of reproduction, affirmed the master's finding. The evidence showed that the original cost of the ship was $557,000. Six years before the loss she had been reconditioned at a cost of $90,000, and the evidence showed "that she was unusually well kept up and in excellent condition for use." The evidence bearing upon the reproduction costs is thus discussed by the Supreme Court of the United States:

"Respondents called three witnesses, experienced in shipbuilding and familiar with construction costs and value of ships in 1918. Each made an estimate of the cost of reproduction of the Proteus as of the date of the loss. Their estimates were, respectively, $1,755,450, $1,750,000, and $1,750,000. One of these witnesses and two others called by the respondent testified, respectively, that in 1918 the value of the Proteus was $1,225,000, $1,297,637, and $1,-

350,000. The petitioner called a mechanical engineer and an able architect connected with its construction department, who testified that the cost of reproduction of the Proteus in 1918 would have been three times its original cost, or approximately $1,670,-000. It called two other witnesses, who had been members of a government board of appraisers for the determination of just compensation for vessels requisitioned. They expressed the opinion that the cost of reproduction of the Proteus in 1918 would have been 2½ times its original cost, or approximately $1,400,000; but they made no detailed estimates. The figures were arrived at by examination of statistics showing labor and material costs. These three witnesses testified, respectively, that at the time of the loss the value of the ship was $630,000, $650,000, and $611,000."

The trial court, in affirming the finding of the master, said: "I have had greater doubt as to the petitioner's exception that the allowance of $750,000, with interest from August 19, 1918, is excessive. But for one fact I should have reached the conclusion that on the entire record *it should be reduced* by $75,000 to $100,000." (The fact referred to dealt with casting depreciation.) When the case came to the Circuit Court of Appeals for the Second Circuit (292 F. 560), that court, in view of the testimony respecting reproduction costs, *increased the award to $1,225,000,* commenting on the fact that the testimony dealing with reconstruction costs as of the date of the loss showed differences varying from one-fifth or one-sixth to more than twice the original cost, and that the valuation fixed by the trial court "was inadequate."

Recurring now to the disposition of the case in the Supreme Court of the United States, it is interesting to note that it approaches the consideration of this question of value, even in admiralty, in the light of the Southwestern Bell, the Bluefield, Georgia Ry., and the Ohio (supra) and other cases. The court says:

"Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotia-

tions between an owner willing to sell and a purchaser desiring to buy. Brooks-Scanlon Corporation v. U. S., 265 U. S. 106, 123, 44 S. Ct. 471, 68 L. Ed. 934. And by numerous decisions of this court it is firmly established that the cost of reproduction *as of the date of valuation* constitutes evidence properly to be considered in the ascertainment of value [citing Southwestern Bell and other cases, supra]. * * * The same rule is applied in England [citing cases]. It is to be borne in mind that value is the thing to be found, and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts."

The evidence in the foregoing case and its critical analysis by the court are here referred to. It suffices to note the concluding estimate given by the Supreme Court: "We think the commissioner and District Court failed to give *due regard to construction costs, conditions, wages, and prices* affecting value *in 1918,* and that the evidence sustains the decree of the Circuit Court of Appeals."

These cases exhibit strikingly the conception entertained—and enforced—by the Supreme Court on this matter of evidence. True, they do not expressly confirm the interpretation which, in the Monroe Gas Co. Case, was put upon Southwestern Bell, Bluefield, and Georgia Power Cases. They (the two supra) do not say that *dominant* consideration must be given to evidence of reproduction costs, though therein, as well as in the first three cases, the "implication from the results" noted in the Monroe Gas Co. Case is present. But they do show, as did the first three, and that is sufficient here, that where (1) evidence of reproduction costs in a record —and particularly where the commission's formal finding shows it—is unimpeachable, it must be allowed its natural probative tendencies; and (2) all the cases demonstrate, to a certainty, that the degree to which such evidence tends to establish value, perhaps largely in excess of book, historical, or prudent investment values, so called, cannot be arbitrarily or capriciously minimized or frittered away, either by express rule of disparagement, or otherwise, to the end thereby, by indirection, to give dominance, or practically sole effect, to "prudent investment," "historical cost," or other "theories" of valuation. In the Ohio Case the action of the commission in making reductions (arbitrarily one-third) on amounts of working capi-

tal definitely determined on experience, arbitrary reduction on allowances for interest, presumably actually paid, all resulting in arbitrarily deducting approximately 6 per cent. from its own reproduction cost showing of $154,000, this all has its counterpart before us in the defendant's reduction of coal bills, expense of a general office in Boston, to the end of reducing the necessity or propriety of income.

The effect of the Ohio decision is that, when such a course is pursued, courts cannot overlook it with the thought that it dealt with trifling items, if *in result* the responsibility of fairly judging evidence is shown thereby to be evaded. And in the second case, although the master and the trial court, in the finding of $750,000, added approximately 16 per cent. to the original, plus the reconditioning cost of the Proteus ($557,000 plus $90,000), or 34 per cent., to her original cost, both appellate courts apparently saw therein no due, reasonable, or "adequate" consideration of the evidence of reproduction costs, whose minimum figure approached or exceeded twice the finding. The effect of all of these cases is that courts and commissions cannot first disparage evidence to the extent, perhaps, of 90 per cent., and then insist that a finding, because it may equivocally or conjecturally show the other 10 or 15 per cent., reflects, not *disparaged,* but *fair* and *adequate, consideration* of the whole evidence.

The plaintiff, in our judgment, has made out a plain case, and is entitled to an injunction.

LUSE, District Judge, concurs in the foregoing.

EVAN A. EVANS, Circuit Judge (dissenting). Plaintiff is a public utility, supplying water and fire protection to the city and residents of Ashland, a municipality located in the northern part of Wisconsin, on Lake Superior. Believing that its rates were inadequate, plaintiff applied to the Railroad Commission of Wisconsin for an increase. After a full hearing the Railroad Commission increased by $4,000 per year the hydrant rental charges, but otherwise made no change.

Alleging that the rates thus fixed are confiscatory, plaintiff seeks an injunction to restrain the commission and the Attorney General from interfering with its installation of the proposed charges, which, it asserts, are reasonable. The hearing upon the application for the temporary injunction was upon the pleadings and affidavits. Attached to the complaint was the report of the commission, a statement of existing and proposed rates, and in the affidavits supporting or opposing the application appear many facts, all more or less relevant upon the issue of value.

Generally speaking, the application is based upon the alleged failure of the commission to give plaintiff a fair valuation of its property, though other and less important criticisms are made. The statement of facts will be made largely upon the theory that error in valuation is the basis of attack. The history of the utility may be found in the report of the commission, which we assume is supported by evidence. This report is too long to be copied, and the salient facts only will be taken therefrom.

The hydrant rental which the city was required to pay under the old rates was $25,000 per year. This was increased to $29,000 per year. The meter rates in force were 12 cents for the first 12,500 cubic feet, 8 cents for the next 37,500 cubic feet, and 6 cents for all over 50,000 cubic feet, per month. The proposed rates are 22½ cents for the first 12,500 cubic feet, 15 cents for the next 37,500 cubic feet, and 12½ cents for the next 50,000 cubic feet.

Comparing the existing rates in Ashland with rates of 21 other cities of like character and rendering like service, in the state of Wisconsin, it appears that the average consumer in said 21 cities paid $1.684 for 2,000 gallons, whereas in Ashland the charge was $3.48. If he used 5,000 gallons, the consumer's charge was $1.87 in the 21 cities, and $4.20 in Ashland. If he used 10,000 gallons, the consumer paid $2.895 in the said 21 cities, and $5.40 in Ashland. Similar statistics showed that for fire protection Ashland paid $2.218 per capita, while the average charge for fire protection in the state of Wisconsin was $0.998. The proposed rates would make the charge to the consumer on meter basis a little more than four times the average rate paid in the state of Wisconsin for like services.

A table showing revenues and expenses for the years 1921, 1922, 1923, and six months of 1924 appears; the total revenues being $88,502.76, $89,250.14, $89,605.57, and $44,598.51. The total expenses for these 3½ years were $49,884.98, $48,721.99, $49,257.43, and $26,110.55. The greatest net revenue was obtained in the year 1922, $40,528.15. The commission, however, took the year 1923, which showed a net revenue of $40,348.14, as the basis of its estimates.

The company was organized in 1891, and certain stock was promptly issued to promoters without consideration. Speaking of this improper corporate financing the commission said: "The city contends, and apparently with good cause, that this amount represents excess payments made to the firm of Wheeler & Parks for services rendered by it on a contract made in October, 1891. The tangible services represented by the firm had been computed by the city's representatives at about $40,000, and the intangible services at about $10,000, leaving the balance of $199,000, which was paid to the company in the form of stock as being unearned."

The book value of the plant on December 31, 1924, was $756,128.11. The sum of $149,000 should be deducted therefrom. Using its experience and knowledge respecting the life of depreciable property, the commission found: "Computations of the composite life of the depreciable property indicate that it is not less than 55 years, which on a 4 per cent. sinking fund basis would require an annual allowance for depreciation of .52 per cent. of the value of the depreciable property." The utility insists that this is too small.

The commission upheld the contention of the utility that the value of certain reservoirs should be included, notwithstanding they were oversized. Likewise the commission found in favor of the utility as to the value of that portion of an intake main extending into the lake beyond a point 800 feet from the shore. The city does not concede the correctness of these allowances.

After the utility laid its mains, certain of the streets of the city of Ashland were paved. The utility contends that in determining present value the cost of laying the mains with paved streets should be considered, rather than the costs in unpaved streets. This item is not large.

The chief criticism, however, arises out of the alleged failure of the commission to give reproduction cost that consideration which it is claimed should be given it, in view of the decisions in the cases of Southwestern Bell Telephone Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807, Bluefield Co. v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176, and Georgia Ry. v. Railroad Commission, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144.

The commission had four appraisals submitted. The first—the one it accepted— proceeded upon the theory of the so-called split inventory. The property inventoried (and there was no dispute in respect to the property owned by the utility and devoted to public use) was divided into two classes: That which was in existence January 1, 1916; and all property added subsequent to such date. The value of the first class of property was determined by taking the average unit price of such articles for the ten years preceding January 1, 1916. The balance of the property was appraised at actual investment cost, as shown by the Company's records. To this valuation was added 15 per cent.

The second appraisal was made by taking the average unit price of all articles for ten years, ending January 1, 1924. The third appraisal was made upon the same basis as the second, excepting the average unit price was for five years preceding January 1, 1924, instead of the ten years preceding 1924. The fourth appraisal was furnished by the company, and was obtained by taking the average unit price during December, 1923.

The first appraisal produced a new valuation of $605,734, and a depreciated value of $516,007; the second, $884,169 new, and $757,178 depreciated; the third, $1,067,163 new, and $915,424 depreciated. The valuation on the fourth basis was $1,057,450 new, and $948,540 depreciated. The commission allowed an additional $15,000 for working capital.

Plaintiff had on previous occasions made application to the commission for a modification of its rates, and its property had been previously valued. It alleges that in 1914 the valuation was fixed at $480,000; that between 1914 and 1919 increases in rates had been granted. It is inferable that such increases were due to increased cost of operation, rather than to an increase in valuation of the property.

The commission properly took the year 1923 as the test year. It was the last full year for which a report of revenues and expenses was obtainable. The net revenue for this year was less than for the year 1922, but larger than for the year 1921. The gross revenues for each of the three years and for the six months of 1924 varied but slightly. The balance "for depreciation and return" for 1923 was $40,308.14. The commission reduced two of the expense items, one for coal and one for an overhead charge attributable to the Boston office. The commission said: "The net effect of the above adjustment is to increase the balance available for depreciation and return by $2,310.85, or $42,258.99 based on the year 1923."

After giving its reasons for fixing .52

per cent. for depreciation, the commission continues: "On the basis of the value found in the valuation this would have amounted to $3,085, *leaving $39,574 available for return upon the property.*" The commission added $1,000 for hydrant rental charge, making a total of $43,574 available for return on investment. Upon the basis of a 6 per cent. return, this would allow for a valuation of $720,000.

The question then arises: Does the showing made on this application disclose (a) a valuation in excess of $720,000; or (b) an error in finding that $43,674 is available for return on investment?

Some of these findings have been attacked by the utility, and others by the city. On this application for a temporary injunction we do not believe we are justified in disallowing the reduction made by the commission for the overhead charge in the Boston office, nor say that the reduction in the price of coal was unjustifiable. Nor can we reject the commission's finding as to the usability of the reservoirs or the intake pipe beyond 900 feet from the shore.

There is some merit in the utility's contention that further readjustment should take place in the way of taxes, for with increased valuation comes increased assessments, and increased assessments are followed by increased taxes. A possible answer, however, lies in the fact that, if a reduced valuation is upheld, a reduced assessment will follow, and thereby a reduction in the taxes.

A careful reading of the three much-discussed cases, all in 262 U. S.—Southwestern Bell Telephone Co. v. Public Service Commission, Bluefield Co. v. Public Service Commission, and Georgia Ry. v. R. R. Commission, supra—leads to the conclusion that there was no intended conflict between the so-called Georgia Case and the Bluefield Co. Case. It is not our duty nor our privilege to attempt to stress or minimize what Justice McKenna pointed out in the dissenting opinion in the Georgia Railway Co. Case, nor to reconcile Mr. Justice Brandeis' concurrence in the Bluefield Co. Case with the views by him stated in the Southwestern Bell Telephone Co. Case.

I conclude that, under the rule laid down by the three decisions, it was necessary for the commission, in determining value for rate-making purposes, to give consideration to present reproduction cost. Not only must the commission give consideration to it, but such factor must find reflection in the finding of value. In other words, it is not a compliance with this rule for the commission to merely hear evidence upon present reproduction cost, and then disregard it entirely in making a finding on value. Nor can it be said that the rule is met if the commission receives evidence of reproduction cost, considers it, and allows a sum so small as to indicate clearly it was not complying with the spirit of the rule announced in these decisions.

The language used in the Georgia Railway Case, herewith quoted, doubtless accounts in large part for our failure to fully agree. The court says:

"The lower court recognized that it must exercise an independent judgment in passing upon the evidence; and it gave careful consideration to replacement cost. But it likewise held that there was no rule which required that in valuing the physical property there must be 'slavish adherence to cost of reproduction, less depreciation.' It discussed the fact that since 1914 large sums had been expended annually on the plant; that part of this additional construction had been done at prices higher than those which prevailed at the time of the rate hearing; and it concluded that 'averaging results, and remembering that values are * * * matters of opinion, * * * no constitutional wrong clearly appear.' The refusal of the commission and of the lower court to hold that, for rate-making purposes, the physical properties of a utility must be valued at the replacement cost less depreciation was clearly correct."

Further, the court said in the same case:

"The question upon which this court divided in the Southwestern Bell Telephone Case, supra, is not involved here."

While this language justified the commission in placing a value upon the property of the utility at a sum other than "the replacement cost less depreciation," we differ as to the extent which the reproduction cost should enter as a factor in determining value. In this case it is apparent that the commission, not only received evidence on reproduction cost, but gave it due consideration and made allowance therefor.

The commission had the valuation which it had fixed in 1914, to wit, $480,000, and which valuation had been the basis for rate-making purposes for many years. Apparently there was acquiescence in this valuation by the city, the utility, and the rate-making body. The book value of the company, as found by the commission, was approximately $606,000, not very much out of line with the 1914 valuation when the additions are considered.

Certain items (those installed since 1916) were valued at their cost price, which it is fair to assume was not far from present reproduction cost. The commission also found: "To the value thus arrived at the engineers added an amount representing 15 per cent. of the estimated cost of the property in service as of January 1, 1916, as one measure of the increase in value of that portion of the property installed prior to January 1, 1916, to which the Ashland Water Company is entitled for purposes of this case."

One question is, therefore, whether an allowance of a certain sum, or a definite per cent., as and for reproduction cost, is a compliance with the rule announced in the three cases heretofore referred to. To say that the court should give "due" or "substantial" or "reasonable" consideration to certain evidence disclosing present reproduction cost contributes nothing enlightening to the discussion; for we would still be dealing with mere words of general meaning. Likewise enlightenment cannot come from the use of the word "dominant," as modifying factor.

More helpful would be the suggestion that the court follow the pronouncements made in analogous cases, such as condemnation suits. *All factors pertinent and relevant to the issue of value* should be given consideration by the fact-finding tribunal. It is for such fact-finding tribunal to determine from all of the testimony the probative value of each factor. When the duly constituted trier of fact has considered all of the proper factors, and its verdict or finding reflects such fact, the finding cannot be assailed because a fixed sum or a certain percentage is allowed as the equivalent of a certain factor. Such action does not indicate arbitrariness, except in so far as any finding on a disputed issue of value is necessarily arbitrary.

There were unusual circumstances, which might have justified and perhaps required the commission to minimize the effect of the testimony showing reproduction cost. I think this evidence was sufficient to justify the commission in refusing to allow any large sum for present reproduction cost.

Not only had there been a valuation fixed by the commission and used as the rate-making basis for ten years, but the company's books also showed a valuation very much less than present reproduction cost. The last valuation was fixed in 1919, when prices had reached their peak. A previous valuation had been made in 1916. Certainly some weight should be given by the commission to previous appraisals that were satisfactory to both parties and acquiesced in for years.

Moreover, the conditions existing in Ashland were exceptional and abnormal. The waterworks plant was originally constructed on the theory that Ashland was about to enjoy a boom and shortly become a city of perhaps 30,000 people. Instead of realizing this expectation, the state and national census show the city's population to be constantly decreasing. From the affidavits presented it appears that many industries had withdrawn from the city, that plants had closed, that there was little market for property, that rentals had dropped, and that when sales were made the prices realized were far below reproduction cost. We are, of course, unable to say what influence, if any, these figures had upon the commission. It must be conceded, however, that plaintiff's situation is quite unusual, and justifies the language of the court in the Georgia Railway Case above quoted.

The service which plaintiff furnishes is not unusual or extraordinary. Located upon one of the Great Lakes, its problem has not been different from that of many other cities in the state of Wisconsin. Its present rate is already twice the rate charged in the other cities in Wisconsin similarly situated, rendering similar service, and, if the new rate is enforced, the individual consumers of Ashland will be compelled to pay four times as much as is ordinarily paid for such service in Wisconsin. Certainly consideration must be given these facts. Present reproduction cost cannot be the determining factor in valuation, if the base thus established becomes so high that the rates necessarily charged to produce a reasonable return are prohibitive or destructive. The due process clause of the Constitution does not require the commission to fix a rate that will be destructive of property within the municipality. In Covington, etc., Turnpike Co. v. Sandford, 164 U. S. 578, 17 S. Ct. 198, 41 L. Ed. 560, it is said:

"It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the public, to realize a given per cent. upon its capital stock. When the question arises whether the Legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and

its stockholders. *But that involves an inquiry as to what is reasonable and just for the public.* \* \* \* *The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends.*"

In San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 23 S. Ct. 571, 47 L. Ed. 892, the court was considering the reasonableness of water rates fixed by the supervisors of San Diego county. The court said:

"If a plant is built, as probably this was, for a larger area than it finds itself able to supply, or, apart from that, if it does not, as yet, have the customers contemplated, neither justice nor the Constitution requires that, say, two-thirds of the contemplated number should pay a full return. \* \* \* The statute of California no doubt was contemplating the case of waterworks fully occupied within the area which they intended to supply. It hardly can have meant that a system constructed for six thousand acres should have a full return upon its value from five hundred, if those were all that it supplied. At all events we will not be the first to say so."

It is fair to assume that water rentals would never be so excessive as to drive an industry from a city. But water and water service in Wisconsin are recognized necessities, and the experience of other cities may well be considered in determining the weight to be accorded present reproduction cost.

The embarrassment which the courts will experience in applying any hard and fast rule is apparent. For example, if the present reproduction cost is taken as the sole factor in determining value, plaintiff would be entitled to a reasonable return on over $1,000,000. Upon such a valuation the present rate would be trebled, instead of doubled. In other words, plaintiff has not asked for a rate that its figures showed it was entitled to receive, if present reproduction cost were the sole factor in determining value. It asked merely for a valuation of $800,000, whereas under its Basis D, plus good will, it was entitled to a valuation of over $1,000,000.

And if these results be not sufficiently startling in their nature, let the possibility of future depopulation of Ashland be considered. If the depopulation which has been going on for 30 years increase—if one-half of the present population should leave—the rates would be enormously increased. And if the rule be an unvarying one, we can continue the speculation until a condition would

exist where the utility actually drove the citizens from the city.

Moreover, such a rule would in the long run be as harmful to the utility as to the public; for, if valuation be determined solely or "dominantly" by reproduction cost, what would prevent demoralization of the utility's financing through frequently recurring readjustments, whenever panics or lesser industrial depressions suddenly lower prices? Where conditions are normal—that is to say, where the utility is enjoying the usual normal growth, and where the municipality is moving forward—it is natural to expect the commission to give greater weight to the evidence of present reproduction cost than it will where such evidence, if determinative of the issue of value, further depresses business.

Some dissimilarity in these computations and those made by the commission is due to differences in the rate of return allowed on the valuation. I am of the opinion that a return of 6 per cent. is not confiscatory under the circumstances existing in the city of Ashland, where interest upon invested capital, particularly real estate, is low. The commission endeavored to fix a rate which would return 7½ per cent. upon the valuation. Holding that a return of 6 per cent. does not constitute confiscation necessarily permits of a considerable difference in the base, the valuation of the property. For in an equation where the product is fixed, the multiplicand will vary necessarily as the multiplier varies. The rule which must govern us is stated in San Diego Land & Town Co., supra, as follows: "It is enough if we cannot say that it was impossible for a fairminded board to come to the result which was reached." And "the only question for us is whether it came to a right result."

The finding of revenue available for return on investment is clearly sustained by the evidence. The rate of return necessary to avoid the charge of confiscation may also be accepted as well-nigh settled for Wisconsin. Certainly a return of 6 per cent. or better cannot be said to be confiscatory in that state. The commission's valuation may be exceeded by approximately $100,000, and still the revenue necessary to produce a return of 6 per cent. provided. In other words, in addition to the 15 per cent. which the commission added to its Schedule A to take care of reproduction cost, there may be added another $100,000, and still the revenue would be sufficient to pay a 6 per cent. return upon such valuation.

Nor should we overlook the fact that we

are disposing of an application for a temporary injunction. We are not passing finally upon the issues presented by the pleadings. The Wisconsin Railroad Commission occupies a position which entitles its findings to certain presumptions. We may assume that this commission is thoroughly familiar with the questions of operating cost, construction cost, and other questions entering into the experience of public utilities in the state of Wisconsin, including electric, gas, water, and street car companies. It is likewise familiar with the history of the state and the development and growth of the cities therein.

Strong reasons, therefore, exist for our adopting its finding respecting cost of coal, allowance for overhead, the plant's life expectancy, the required size of reservoirs, the distance intakes should run into the lake, etc. Moreover, its doors are always open for new applications, either on the part of the utility or the public. Its orders are, at most, only temporary.

Likewise this court, in passing upon an application for a temporary injunction, is merely disposing of the matter until full opportunity may be given to both parties to present oral testimony on the question of interest rates, coal prices, construction prices, etc. It is therefore my opinion that the application for an injunction should be denied.

If granted, however (and I understand the majority of the court are in favor of its allowance), another question arises: To permit the utility to put into effect that rate which will produce a 6 per cent. return upon a valuation far in excess of what it claims to be the fair valuation of its property would be inequitable. The allowance of any injunction, therefore, should be only upon condition that the rates which the utility may charge are fixed, and such injunction should be effective only until the Wisconsin Railroad Commission may again hear and determine the matter anew.