## THE CUSHING.

### Petition of STANDARD OIL CO. OF NEW JERSEY.

#### (District Court. S. D. New York. October 17, 1922.)

1. **Evidence ⟝113(1)—Market value of ship not true test under abnormal war conditions.**

    While the market price of standard commodities commonly bought and sold may be the fairest test of their value, when the normal conditions of free competition have full play, it fails when the conditions which make the test a proper one do not obtain, so that the market value of a ship during the war, when there was a time monopoly in ships, and their value soared out of proportion to the cost of construction of new ships, though that, too, had increased abnormally, is not a fair test of the value of a ship sunk by a collision.

2. **Evidence ⟝113(21)—Fair value of ship under requisition must be predicated on that fact.**

    The value of a ship which was under requisition by the government during the war at the time she was sunk by a collision must be predicated on that fact; the test not being what would be a fair value between private litigants, if it had not been under requisition.

3. **Evidence ⟝113(21)—Fair value depends on all circumstances, not market price alone.**

    If evidence is adduced indicating that the market price is not fair under the circumstances, all other relevant facts should be considered in determining fair value, unless some positive norm for ascertaining such value is established by legislation.

4. **Evidence ⟝113(10)—Reproduction cost, less depreciation, is not sole test of value.**

    While a fair value of a ship lost would not generally exceed the estimated cost of reproduction, less depreciation, that standard cannot be regarded any more than the market value as the ultimate criterion of the fair value.

---

⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. Evidence ⬦➠113(10)—Increase of cost of ships due to war does not affect value of existing ships.

The increased cost of making ships, due to the necessity for rapid construction during the war, which justified the government in paying bonuses for speed of construction, should not be considered in determining the fair value of an existing ship, which was sunk by collision during the war.

6. Evidence ⬦➠113(1)—Depreciation allowed from cost of reproduction, notwithstanding increased value.

In determining the fair value of a ship sunk by collision during the war, depreciation should be deducted from the fair cost of reproduction, even though the value of ships was increasing, rather than depreciating, since the increased value was already allowed for in estimating the cost of reproduction.

7. Evidence ⬦➠142(4)—Amount for which sister ship was insured is admissible on question of value.

In determining the value of a ship sunk by collision during the war, the amount for which a sister ship was insured with the Bureau of War Risk Insurance, through its advisory board, on which sat some of the best marine insurance men in the country, and which in formulating its valuations designed to afford fair, if not liberal, protection to shipowners, is admissible on the issue of value.

8. Shipping ⬦➠209(3)—Evidence held to sustain commissioner's finding as to value of ship sunk during war.

Evidence in proceedings to exonerate or limit liability for the sinking of a ship during the war held to sustain the finding of the commissioner, fixing the value of the ship sunk against exceptions by both parties.

9. Evidence ⬦➠113(1)—Full depreciation according to table not deducted, where ship was excellently maintained.

In determining the value of a ship sunk in collision during the war, the full depreciation according to tables of ship depreciation need not be deducted from the cost of reproduction, where the vessel had been excellently maintained during the 18 years of its service.

In Admiralty. Petition by the Standard Oil Company of New Jersey, as owner of the steamship Cushing, for exoneration from or limitation of liability for a collision between its steamship and the steamship Proteus. On exceptions by both parties to the findings of the commissioner, fixing the value of the Proteus. Exceptions overruled, and finding of commissioner confirmed.

See, also, 266 Fed. 570.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (W. H. McGrann, of New York City, of counsel), for petitioner.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles C. Burlingham and A. Howard Neely, both of New York City, of counsel), for claimant.

MACK, Circuit Judge. The question at issue is the value of the steamship Proteus, which was sunk on August 19, 1918, in a collision with the steamship Cushing, owned by the Standard Oil Company of New Jersey. The Proteus was owned by the Southern Pacific Company and was under requisition to the Director General of Railroads. The commissioner fixed the value of the Proteus at $750,000. Both parties have objected to his finding; the Southern Pacific Company as too low, the Standard Oil Company as too high.

[1] In August, 1918, practically all American ships of the size and type of the Proteus were under requisition, and the market for all such ships was for all substantial purposes closed during the war. It is, however, a matter of common knowledge that during 1917 and 1918 there was what might be termed a "time monopoly" in ships. The submarines were taking their toll without stint, and ships could not be built fast enough to supply the Allies' needs. Ships which happened to be free from requisition (the American requisitioning policy did not become general as to ships in the course of construction until August, 1917, and as to ships afloat until October, 1917) were able to make huge monopoly profits from a single voyage. The so-called market value of ships soared, even out of proportion to the cost of construction of new ships, although this, too, had also increased abnormally, on account of the unprecedented demands and the comparative shortage of shipbuilding facilities. While the market price may be the fairest test of the value of standard commodities commonly bought and sold, when the normal conditions of free competition have full play, this test obviously fails, not only if there is no market, but when the conditions which make the test a proper one do not obtain. Prior to the intervention of the government, private shipowners may have been entirely justified in exacting from private shippers all the traffic would bear, since under the conditions prevailing a reduction in freights would not necessarily have inured to the benefit of the public here or abroad, but rather to the shippers fortunate enough to obtain shipping space.

[2] It would seem to me clear, however, that the shipowners had no vested right to earn profits from the war necessities, and that such market as prevailed just prior to the requisitioning was no necessary test of the fair value under the circumstances of a ship purchased or used by the government under its requisitioning powers. Cf. City of New York v. Sage, 239 U. S. 57, 61, 36 Sup. Ct. 25, 60 L. Ed. 143; Lawrence v. Boston, 119 Mass. 126, 128; Lanquist v. Chicago, 200 Ill. 69, 73, 65 N. E. 681; Brown v. Calumet River Railway Co., 125 Ill. 600, 606, 18 N. E. 283; U. S. v. Inlots, 26 Fed. Cas. No. 15,441. It is not necessary to consider here what would be fair value under the circumstances between private litigants, if the steamship Proteus had not been under requisition. The Proteus was under requisition, and the ascertainment of her value must be predicated on that fact. Kia Ora (D. C.) 246 Fed. 143; Harries v. Shipping Controller, 14 Aspinall M. C. 320.

[3] While, as above stated, under normal conditions the market price of standard commodities might be taken as the exclusive test of value, it is fair value under the circumstances, rather than market price, which is the ultimate criterion. If evidence is adduced, indicating that the market price is not fair under the circumstances, then all other relevant facts should likewise be considered in determining fair value, unless indeed some positive norm for ascertaining value is established by legislation. Cf. the rate regulation cases; Minnesota Rate Cases, 230 U. S. 352, 434, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

All the relevant facts should be considered. The cost of reproduction, less depreciation, has been commonly adopted as a standard for rate-making purposes. Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371; Denver v. Denver Union Water Co., 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649. But there are difficulties of theory and practice in the application of the standard. Whitten, 27 Harvard Law Review, 419, Henderson, 33 Harvard Law Review, 1031. And the rule has been limited in important respects. Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 171, 172, 35 Sup. Ct. 811, 59 L. Ed. 1244; Minnesota Rate Cases, 230 U. S. 352, 452, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

Recently there has been a tendency among legal and economic writers to bring to the fore the prudent investment standard (Richberg, 31 Yale Law Journal, 263, 266, 279; Hale, 30 Yale Law Journal, 710, 720; Henderson, supra; Whitten, supra; Friday, 36 Quarterly Journal of Economics, 197, 211; Scharfman, The American Railway Problem, c. 8, § 4) which has not been unnoticed by the United States Supreme Court (Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 Sup. Ct. 351, 66 L. Ed. ——, decided April 10, 1922).

[4] While it would seem that fair value would not generally exceed the estimated cost of reproduction, less depreciation, and under normal conditions of free competition the cost of reproduction, less depreciation, should approximate fair value, reproduction cost, no more than market value, should necessarily be regarded as the ultimate criterion of fair value. In 1918 the cost of reproduction, no less than market price, was affected by the temporary national necessities. Time was the essence of real governmental economy in prosecuting the war. The government could afford to pay more for labor and more for material and for all else, if only the ships could be built. The shipyards were closed for building for private account from August, 1917, until after the end of the war.

[5] It appears that costs of production increased not inconsiderably during this interval, and such costs were riding toward their peak in August, 1918, although the actual peak seems to have been reached a few months later. There is evidence that the market declined after the war, but the extent and character of the decline were not clearly explained. It seems to me plain that the increase in the cost of reproduction after the government took over control of the shipyards and closed them for building for private account, is to be ascribed practically solely to war conditions, and that such increase should not be regarded as affecting the value of ships under requisition. If it did, the government should have increased the requisition rates with every bonus or inducement it was willing to offer to the shipyards or their men to speed up their production in the great national emergency.

It would seem, therefore, proper, in finding the fair value of the Proteus in August, 1918, to discount the then cost of reproduction. There were undoubtedly increases over the pre-war (1914) values, which should not be discounted or regarded as purely speculative The evidence in this case is not complete enough to warrant broad

generalizations. Doubtless the fair value of requisitioned ships during the war was higher than similar ships were worth after the war; and, if destroyed during the war, the latter value would not be a fair measure of compensation. But, on the other hand, the national necessities, and the consequent cost of new ships built during the war to meet them, furnish no fair test for compensation of requisitioned vessels lost or destroyed during the war. In the rate-regulating cases, war values are discounted in arriving at a fair estimate of the cost of reproduction. Galveston Electric Co. v. Galveston, supra.

[6] Witnesses for the Proteus have estimated that it would cost in August, 1918, about $1,750,000 to reproduce her as a new ship. The items making up this estimate seem throughout to have been calculated on a fairly liberal basis, with no discount for any war costs. It is argued that not more than $525,000 should be taken off for depreciation, because, while under normal conditions the allowance for depreciation would be increased, "during the war, when vessel property was very valuable, the appreciation more than made up for the depreciation." But, as the learned commissioner pointed out, if full effect is given to the war in fixing the reproduction value, the normal rate of depreciation ought not to be changed. Even if $1,750,000 were taken as the value of the Proteus if new, as a ship which had seen service for 18 years, she would not be worth more than $791,000, if depreciation were allowed on the basis of the rather conservative depreciation table prepared by Mr. Stevenson Taylor, of the American Bureau of Shipping, for the use of the Naval Board of Appraisal, of which he was a member. According to this table, an 18-year old ship is worth .452 of her original cost.

The petitioner's witnesses, on the other hand, estimated the cost of reproduction of the Proteus in August, 1918, to be not in excess of $1,400,000. If depreciation were deducted from this amount according to the Stevenson Taylor table, the value of the Proteus would be about $633,000. Captain Gillmoor, who seems to have given considerable thought to the question of ship values, testified that $650,000 "would be an outside value * * * as of August, 1918." Even if the petitioner's witnesses were somewhat low in their estimates of the costs prevailing in August, 1918, these costs, unless discounted, would, as has been observed, include abnormal war charges to some extent.

[7] The Comus, a sister ship of the Proteus, was insured with the Bureau of War Risk Insurance for $690,000. This seems to have been in excess of the maximum value for which the bureau would ordinarily insure under the scale of valuations formulated on August 26, 1918, through its advisory board, on which sat some of the best marine insurance men in the country. While the board undoubtedly had in mind the interest of the government in formulating its valuations, the scale was also designed to afford fair, if not liberal, protection to American shipowners. The scale might, on the one hand, be thought to be a little unfair as a measure of the fair value of a passenger ship. On the other hand, only 12½ per cent. of the value allowed for a new ship had to be deducted as depreciation for an 18-year old ship, which provision would indicate that the legitimate in-

terests of the owner of a ship like the Proteus could not be said to have been slighted or overlooked.

[8] While overruling the exceptions of the claimant as to the admission in evidence of the amount for which the Comus was insured and the book value of the Proteus, it is to be noted that the commissioner has stated that, disregarding this evidence, the result would be unchanged. The court, too, has reached the same conclusion. Each and all of the exceptions of the claimant are overruled.

[9] I have had greater doubt as to the petitioner's exception that the allowance of $750,000, with interest from August 19, 1918, is excessive. But for one fact, I should have reached the conclusion that on the entire record it should be reduced by $75,000 to $100,000. I am of the opinion, however, that the Stevenson Taylor depreciation table is not to be arbitrarily applied in a case of this kind, and that consideration is to be given to the actual upkeep of the vessel in question in determining the percentage of depreciation. The evidence satisfies me that this vessel, like the other vessels of the claimant, was excellently maintained, and that, giving due effect to this consideration, the result reached by the commissioner would seem to afford full and ample compensation. The exception, therefore, of the petitioner will likewise be overruled, and the amount fixed by the commissioner, $750,000, with interest from the date of the loss, will be confirmed.

The claimant and the Director General, I assume, have come or will come to an agreement regarding their respective rights as to the interest accruing during the period of requisition. Unless some agreement has been reached, I assume that the government is entitled to the interest during the period of requisition, and the claimant to its agreed compensation.