THE PRESIDENT MADISON.

AMERICAN MAIL LINE, Limited, v. SKAGIT RIVER NAVIGATION & TRADING CO. et al.

No. 8125.

Circuit Court of Appeals, Ninth Circuit.
Aug. 23, 1937.

Bogle, Bogle & Gates, Lawrence Bogle, Cassius E. Gates, and Edward G. Dobrin, all of Seattle, Wash., for American Mail Line, Limited.

Kerr, McCord & Carey, Stephen V. Carey, and J. L. Collins, all of Seattle, Wash., for Skagit River Navigation & Trading Co.

C. E. H. Maloy, of Seattle, Wash., for Washington Tug & Barge Co., Tugs & Barges, Inc., H. F. Haines, and Petroleum Nav. Co., Inc.

Bayley & Croson and F. B. Fite, Jr., all of Seattle, Wash., for Northland Transp. Co.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal by American Mail Line, Limited, claimant of the steamship President Madison, from interlocutory and final decrees in libels brought against the vessel and her owners by Skagit River Navigation & Trading Company and others, adjudging that respondent American Mail Line is liable to appellees for damage done when the President Madison broke from her moorings in Seattle during a windstorm of unprecedented violence and drifted against appellees' vessels, causing the injuries for which relief is sought. The appeal from the interlocutory decree takes issue with the District Court's finding of fault in the President Madison. The American Mail Line appeals from the final decree on the same ground and also assigns error to the amount of damages awarded the Skagit River Company. All shipowning appellees take cross-appeals from the final decree, asserting error in various amounts awarded.

An admiralty appeal requires us to consider the evidence de novo. This consideration is controlled not only with reference to the burden of proof, but also where, as here, the evidence of fifty-two witnesses, all heard by the District Judge at the trial, required a record of testimony of over one thousand pages, by a rebuttable prima facie presumption that the findings of the trial judge are correct. This presumption, where all these fifty-two witnesses were heard by the trial judge, "has very great weight." The Ernest H. Meyer (C.C.A. 9) 84 F.(2d) 496, 501. However, the existence of the presumption does not relieve us from a careful consideration of all the evidence to determine its weight against the presumption in favor of the lower court's findings. The Ernest H. Meyer, supra (C.C.A.) 84 F.(2d) 496, 501.

The burden of proving absence of fault is upon a vessel which breaks from her moorings and drifts on and collides with moored vessels.

"The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution, and a proper display of nautical skill could not have prevented." The Louisiana, 3 Wall.(70 U.S.) 164, 173, 18 L.Ed. 85; The Buffalo (C.C.A.) 56 F. (2d) 738, 739 (and cases cited).

On October 21, 1934, the President Madison, out of commission, was moored to Pier 41, Port of Seattle. This pier is 2,505 feet in length, running south from the land into Puget Sound. Lying 347 feet to the easterly was a parallel pier, No. 40. The vessels with which the drifting President Madison collided were moored to these piers and lay to the northerly of the latter.

The President Madison had been permanently moored since the preceding August to the east side of Pier 41. She was headed offshore, with her bow about 100 feet inside the south end of the pier. The vessel was 535 feet long, 72 feet beam. Her draft was 14 feet forward and 24 feet aft. Her tonnage was 14,187 tons. At the time in question she was light. The double bottoms were full of salt and fresh water weighing 1,610 tons and there were 140

tons of fuel oil on board. The District Court found that the vessel's metacentric height was very close to zero. At 12:40 p. m., approximately the time she broke from her moorings, the vessel's stem was 43 feet above the water and more than 31 feet above the pier. The total height of the sun deck above the pier was 52.9 feet. Thus she presented a broad surface to winds off the starboard bow, and there were no buildings or other obstructions on Pier 41 which would mitigate the force of such winds.

On October 21, 1934, a windstorm of unprecedented proportions struck the Pacific Northwest. Weather reports, local and state, issued the preceding evening, gave no hint of the force of the gale which commenced about 8 o'clock in the morning. Official records taken by anemometer at Boeing Field show the following average velocities: From 8 to 9 a. m., 12 miles per hour; from 9 to 10 a. m., 19 miles; from 10 to 11 a.m., 29 miles; from 11 to 12, 30 miles; from 12 to 1 p..m., 35 miles; from 1 to 2 p. m., 34 miles. Also registered at Boeing Field, by Dines pressure anemograph, were the maximum single gust velocities during each hour. There were: At 8:47 a m., 27 miles per hour; at 9:43, 38 miles; at 10:45, 55 miles; at 11:54, 65 miles; at 12:20 70 miles; at 1:15, 69 miles; at 2:56, 69 miles.

The official weather station on top of the Exchange Building recorded the following average hourly velocities for October 21: 8 to 9 a. m., 19 miles per hour; 9 to 10, 26; 10 to 11, 41; 11 to 12, 43; 12 to 1, 50; 1 to 2, 49. The anemometer on the Exchange Building also recorded maximum velocities based on the fastest five-minute period during each hour. These were: 9:43 a. m., 37 miles per hour; at 10:48, 46; at 11:42, 53; at 12:42, 56; at 1:39, 54; at 2:36, 59.

That the storm was unprecedented is shown by the meteorological records. The highest five-minute velocity during the preceding 41 years was 53 miles per hour in December, 1924.

The Exchange Building anemometer recorded the wind as southeast until 12 noon, then shifting to south until 2 p. m. At Boeing Field, nearby, the direction was recorded as southeast from 7 to 8 a. m.; south-southeast from 8 to 10; south from 10 to 11, and south-southwest from 11 to 2.

On the evening of October 20th, the local forecast for Seattle predicted "southerly winds" for the following day. The district forecast for Oregon and Washington included "fresh southerly winds offshore, strong at times." A "strong wind" is one between 25 and 38 miles per hour.

At 7 a. m. on the morning of the 21st, the district forecast at San Francisco wired the Seattle Weather Bureau that a "whole gale" was in the offing. A "whole gale" is a wind from 55 to 75 miles per hour. Shortly thereafter, the whole gale storm warnings were displayed on top of the Exchange Building, at the Seattle Yacht Club, and on the north shore of Lake Union. A "whole gale warning" consists of two flags, flown one above the other, each eight feet square, red with a black center. In addition to displaying the warnings, the weather office made attempts to reach many steamship lines, including appellant, by telephone; but, the day being Sunday, no one was reached at appellant's office.

The tide, on the morning of October 21st, was rising between 9:54 a. m. and 3:17 p. m. Its range was approximately eight feet.

At approximately 1 p. m. the President Madison, under pressure of the high winds, broke from her moorings. The forward spring and breast lines, practically simultaneously, pulled out portions of the pier, and the vessel's head swung away from Pier 41, having now only the two bow and breast lines to hold her bow in. These lines snapped and the bow swung over towards Pier 40, 347 feet to the east of Pier 41. Next, the after spring and breast lines tore out portions of the pier, leaving only the three stern and breast lines intact. Two of these then parted and the third unwove from the bitts on the ship.

The bow of the President Madison then swung over and hit Pier 40; and the wind forced the vessel northward in the slip, her bow scraping Pier 40 and her stern Pier 41. Moored to Piers 40 and 41, landward of the President Madison's mooring place, were the Harvester, owned by appellee Skagit River Navigation & Trading Company; the Aleutian Native, belonging to appellee Petroleum Navigation Company, Inc.; the North Haven, of appellee Northland Transportation Company; and several tugs and barges owned by appellee Washington Tug & Barge Company. In her journey up the slip, the President Madison collided with some of these vessels, forcing them against others, and finally, after

about 45 minutes from the time of breaking loose, came to rest near the north end of the slip.

The Port of Seattle, jointly libeled with the President Madison on a charge of maintaining a pier of insufficient strength for her moorings, was exonerated by the interlocutory decree. There is no assignment by appellant that this exoneration was error. None of the litigants appealed from this holding of the decree.

The appellees owning the vessels injured by the President Madison claim appellant has failed in its burden of proof that the collisions were without her fault. Specifically they claim that the President Madison has not—

(1) Maintained her burden of proof that her moorings were sufficient and properly handled for even the usual heavy winds of that locality;

(2) Maintained her burden of proof that her master, in her charge as watchman, constituted a sufficient manning of the vessel or made sufficient observations of the weather conditions for a proper care of the ship, high above the pier, and hence was unaware that added precautions were necessary for her safety;

(3) Maintained her burden of proof that additional moorings were unnecessary;

(4) Maintained her burden of proof that it was unnecessary to drop her anchors before or after she broke away from the pier, or that the anchors would not have held her on the bottom of the waters between the piers.

■ *The President Madison has maintained her burden of proof that she was sufficiently moored for usually expected weather.*

Eleven lines held the President Madison to Pier 41. Their adequacy being a material question at the trial and on this appeal, it will be necessary to detail the mooring arrangements. The forward lines were as follows: A 1¼-inch six-strand wire cable from the port bow chock leading forward 162 feet to a kevel on the dock, making an angle with the dock of 11 degrees; a 1¼-inch six-stranded galvanized plough steel wire from the starboard bow chock forward 144 feet at 12 degrees; a 1¾-inch galvanized plough steel towing hawser leading from the third chock from the bow forward 94 feet at a 19 degree angle; a 1⅛-inch six-stranded galvanized plough steel wire leading from the second chock

from the bow aft 106 feet at 17 degrees; an 8-inch (circumference) manila line leading from the same chock to the same kevel.

The above is the extent of the forward lines. The arrangement, it will be seen, comprises two long bow and breast lines at 11 or 12 degree angles from the dock, and two relatively short spring and breast lines, forward ahead and forward astern respectively, crossing each other after leaving the chocks to form what the court questionably calls a "toggle joint," and making angles of 19 and 17 degrees with the pier. The forward stern spring and breast line was duplicated in position, angle, and extent by the eight inch manila rope.

The six after lines were as follows: A 1⅜-inch durable steel wire from the port quarter chock 110 feet astern to kevel 8 on the pier, some distance shoreward of the vessel's stern, at an approximate 13 degree angle; a 1¾-inch six-stranded plough steel wire from the starboard quarter chock to the same kevel 95 feet at 11 degrees; a 2-inch plough steel wire towing hawser from the second starboard chock from aft to the same kevel, 126 feet at 10 degrees; a 1¼-inch six-stranded plough steel wire cable from the third chock from aft leading astern 67 feet at 20 degrees; a 1¼-inch six-strand plough steel wire from the same chock leading forward 72 feet at 19 degrees; an 8-inch manila rope leading from chock 4 from aft astern 133 feet at a 10-degree angle.

Briefly, the arrangement of the after lines consisted of three stern and breast lines all fastened to a single kevel shoreward from the vessel; two short spring and breast lines, after ahead and after astern respectively, leading from the same chock; and the long manila rope from the fourth chock from aft, serving as stern and breast line. The chocks were 31 feet, vertically, above the kevels. It will thus be observed that the President Madison was moored with her strongest lines aft.

Herbert S. Bouson, retired Lieutenant Commander, U.S.N., testified for libelants that the President Madison was improperly moored in the first place. His testimony (as well as that of other witnesses for libelants) on the adequacy of the ship's moorings before the storm arose was limited to answering the rather general question as to whether the vessel was moored in a manner dictated by proper seamanship, with no reference to particular weather

conditions. We take it the judge read such testimony as being applicable to weather conditions reasonably to be expected in the Port of Seattle.

Bouson gave it as his opinion that the forward ahead and astern spring and breast lines were too short and at too sharp an angle to the pier. This meant, he said, that any pressure brought on the starboard would "multiply" the strain on these lines; that inasmuch as they were also taking a fore and aft strain and an upward thrust, the side thrust should have been relieved by a longer breast line more nearly abeam the vessel. This he would have provided by running one of the bow and breast lines some distance across the pier as nearly as possible at right angles to it. He suggested other rearrangements of lines upon mooring, but inasmuch as no other witness agreed with him as to these, and the District Court did not follow him as to them, and the appellees do not urge their wisdom, we will not consider them.

Coming down to the day of the accident, Bouson testified that between 10 and 11 o'clock on the morning of the storm, he would have run a forward breast line at right angles to the pier with a lead of 100 or 150 feet. (The pier was over 300 feet wide.) He would have run a similar breast line aft. With six men and a block and tackle he could have accomplished this by 11 o'clock. So reinforced, according to Bouson, the ship would have withstood a 75 to 80 mile wind.

Robert C. Lawe, master mariner, testified for libelants that proper mooring required, in addition to the vessel's existing lines, long right angle breast lines, the longer the better, both fore and aft. This should have been done upon mooring, he averred, but particularly should it have been done when the wind was rising on the morning of the storm. To run these lines would have taken four or five men half an hour, says Lawe. If fastening arrangements were lacking on the pier ends of these suggested long breast lines, planks could have been torn up and the lines made fast to stringers.

Libelant's witness Howell Parker, master mariner, opined that upon the mooring of the vessel lines should have been run to three mooring cables on Pier 41, which cables are 84 feet, 100 feet, and 66 feet, respectively, from the east side of the pier.

O. A. Johanson, duly qualified as an expert, testified that upon mooring, a long bow breast line, 100 or 200 feet in length, should have been run across the pier as nearly as possible at right angles to it. William C. Ansell, also qualified, testified to the same effect and added that the ship should have had a similar breast line aft.

Appellant American Mail Line produced witnesses whose testimony tended to show, first, that the President Madison's lines were all in even adjustment with full allowance for the rise and fall of the tide. This testimony, uncontradicted, was given by Captain Snellenberg, master of the vessel; Roy S. Hanson, who had done watch on the vessel for a portion of the time she was moored in the position she occupied on October 21st; P. C. Arms, who had served as watchman until October 20th; F. W. Brooks, who went off watch at 8 a. m. on the morning of the accident.

Hanson, well qualified as an expert, testified that a long breast line, such as suggested by appellees' witnesses, was unnecessary upon mooring in view of the tested adequacy of the existing lines. Furthermore, he said, such a line was impractical because it would interfere with traffic on the pier. As to running such a line on the morning of the storm, as well as beforehand, he gave it as his opinion that it would be impossible to get such a line on an even strain with the others.

Arms testified that running such additional lines would be impractical, and that it would take nine men at least an hour to run such a line. Witnesses G. J. Snelling, F. W. Brooks, Gus Nocken, Erick G. Froberg, Nelson J. Leonard, Clyde F. Bryant, John F. Blain, A. A. Anderson, Alex M. Peabody, Alex Stinson, and Andrew J. Storrs, all agreed with Arms and Hanson that the vessel was well moored and that the suggested additional lines were both impractical and unnecessary. Glasscock testified that he did not think the dock would hold with a wind over 40 miles per hour, but that the lines were entirely sufficient. Captain Snellenberg said that the only occasion for running a long right-angle breast line would arise when mooring a vessel with her bow up even with the end of the dock.

Nelson J. Leonard, U. S. Navy Lieutenant Commander, undertook to furnish the court with statistics as to the amount of wind pressure exerted upon the vessel in various directions. Balanced against the breaking strength of the lines, his conclusions from the figures was that the lines

would hold in any wind up to 103.2 miles per hour. W. C. Nickum corroborated Leonard's figures.

■ We do not agree with the District Court that the vessel has not maintained her burden of proof that she was properly moored prior to October 21, the day of the storm. The evidence proves the contrary. Testimony that the lines were in even adjustment, including allowance for the rise and fall of the tide, is plentiful and undisputed. The mooring arrangements withstood unprecedented wind pressures for an hour or more before the vessel broke away. The District Judge points out this fact and concludes from it that it was the last "inch" in the rise of the tide that was "the final straw that broke the camel's back." The finding is that it was mid-flood on an eight-foot rise. He seems to conclude from this that the forward spring and breast lines were not properly adjusted to allow for usual tides, a conclusion refuted by ample and uncontradicted evidence. Lastly, it is to be remembered that the pier and not the lines gave way first, and that the court found the Port of Seattle free from negligence in the maintenance of its pier. It follows that the vessel was not negligent in failing to know and guard against defects in the pier. If this be the case, as it is, a conclusion that the vessel was negligent in failing to maintain at all times an additional long breast line on mooring is a conclusion that the appellant should have anticipated a storm strong enough to force the vessel to tear out portions of a reasonably adequate pier. It required an unprecedented storm to do this. Good seamanship does not require foreknowledge of unprecedented events.

*The President Madison failed to maintain her burden of proof that it was not at fault in manning her with but one watchman and in failing to observe the weather conditions and apprehend the approach of unusually heavy winds.*

The President Madison, being laid up, maintained but a single watchman on board. F. W. Brooks went off watch at 8 a. m. and was replaced by Captain Evart Snellenberg, master of the vessel, acting as watchman. No one else was on board until 11:15 a. m., at which time John Jacobsen, appellant's port engineer, came aboard. We are constrained to believe that the then extraordinary wind conditions had something to do with his Sunday visit.

■ When we consider the large tonnage of the Madison, her low metacentric height, the effect on her of surging at the end of the dock projecting into the broad waters of Puget Sound, and her high exposure to the winds, we cannot find her maintenance of her burden of proof against the libelants' charge of insufficient manning. To obtain any aid (say in case of fire), the single watchman must leave the vessel unprotected and walk nearly a third of a mile to the telephone at the shore end of the dock; that is to say, the vessel must be unprotected at the very moment when an emergency required her to be protected. More time would be consumed in making Sunday telephone connections with the persons who are to afford relief, and then in the 1,800-odd feet back to her, boarding ladder or stairs.

Furthermore, we hold that the Madison has not maintained her burden that this undermanning did not contribute causatively to the damage to libelants' vessels.

■ The whole gale storm warning flags were flown on the Exchange Building at 7:40 a. m., twenty minutes before Brooks went off watch and Snellenberg came on the vessel. Both men testified that they did not look towards the Exchange Building, but added that, even if they had, they could not have distinguished the storm signal. The Exchange Building is 2.4 nautical miles distant from Pier 41. Weather Bureau records show that visibility on October 21st was 20 miles. This means that the observer can see at that distance large and conspicuous objects such as buildings. The District Court, on conflicting testimony, found that the storm warnings were readily visible from Pier 41. Indulging the presumption in favor of the local trial court's findings of fact as to visibility, we take this finding as true.

■ Assuming, without deciding, that Captain Snellenberg and Brooks were not negligent in failing to look for storm warnings at 8 o'clock, the conclusion that Captain Snellenberg should have looked for them before 10 o'clock is well justified. Between 9 and 10, the wind maintained an average hourly velocity of 19 miles at Boeing Field and 26 miles on top of the Exchange Building. At Boeing Field there was a single gust of 38 miles per hour at 9:43; on the Exchange Building there was a five-minute period commencing at 9:43 during which the wind blew steadily **at a**

velocity of 37 miles per hour. Thus by 10 o'clock, Captain Snellenberg had experienced a maximum "strong" wind, which had been steadily rising since he came aboard the President Madison. Had he then looked towards the Exchange Building, he would have observed the whole gale warning. Even though he could not, at that distance, have discerned it with the naked eye, it was the captain's duty to have used his glass on the Exchange Building, with the warning of changing weather he then had. If he then had any doubt about the meaning of the signal, he could have called the Weather Bureau and learned of the approaching 55-75 mile an hour gale.

*The President Madison has not maintained her burden of proof that she was not negligent in failing to extend additional breast lines, when the wind, constantly increasing two hours before 10 o'clock, coupled with the storm warnings on the Exchange Building, indicated the likelihood of extraordinary pressure away from the dock on the vessel's high bow.*

■■■ Appellant's excuse that during working days on the pier it could not maintain long breast lines across the lines of railway track carrying the merchandise of the loading and discharging vessels is well taken. As we have held, the existing lines were adequate for usual weather conditions.

■■■ We feel that the President Madison has not shown by a preponderance of the evidence that the placing of additional lines should have not been commenced at 10 o'clock, when the storm warnings and steady rapid increase in velocity of the wind showed the likelihood of excessive strain both from the wind and the surging from a rising storm in the Sound. There should have been a telephone to the Seamen's Hall for enough seamen to do this. The testimony clearly shows they could have been obtained in half an hour's time.

Had they been sent for at 10 or 11 o'clock the added lines would have been fastened well before the vessel broke away.

The libelants' witnesses state that two heavy breast cables leading to the other side of the pier could have been fastened in forty minutes by half a dozen men. The Madison claims it would have taken an hour to an hour and a half for nine men to set one line. The court's finding that the required number of men could have been obtained by a telephone to the Seamen's Hall is not disputed.

We hold the President Madison has not maintained its burden of proof that her breaking from the moorings was inevitable from the storm within the rule of The Louisiana, supra, and that such additional mooring would not have prevented the collision which ensued.

In this we are not unmindful that this was a wooden pier, subject to the usual decay of such material in the moist air under a structure over Pacific waters and that some appeared in the timbers torn loose by the surging and extraordinary pressure on the vessel. However, its long resistance to the wind pressure and surging of the steamer shows no general deterioration.

■■■ It was the duty of the managers of the pier for the port to inspect it and keep it in good repair. The Port of Seattle was charged in the libel as jointly liable with the steamer. While if joint negligence had been shown the port and the steamer severally would have been liable for the full damage, the steamer would have had her right of recoupment for half the damages. Yet, although the court, on conflicting evidence, exonerated the port, neither the President Madison nor the libelants here assert error in this regard. We cannot hold that the burden on the President Madison to prove that it was the condition of the pier which caused the injury suffered by the several moored and helpless vessels has been maintained.

■■■ *The President Madison has not maintained her burden that the collision inevitably would have happened if she had dropped her two bow anchors at least by 11 o'clock, or that the material of the bottom of the slip between the piers would not have held her from the collisions.*

The Madison was equipped with two stockless anchors at her bow, weighing 6½ tons and 5½ tons, respectively, attached to 135 fathoms of anchor chains weighing 447 pounds per fathom. The total weight of the anchor chains was 60.34 tons. The anchor windlass was in good condition. One man in one minute could drop one anchor, or in two minutes, both anchors.

Having failed at 10 o'clock, and certainly culpably failed at 11 o'clock, to send for seamen to assist in fastening additional cables, the captain had another protective measure in dropping these anchors. He thought of this, but delayed until 12 o'clock, because he and the port engineer were en-

gaged in adjusting her after moorings and had no one to send forward to drop the anchors.

Captain Snellenberg testified that about 12 o'clock he started forward from where he had been adjusting the after ahead spring and breast line, for the purpose of letting go the anchors. He says he started to climb the ladder from the after deck to the promenade deck but, arriving at the top, found the wind was too strong for him there. Descending, he went through the passenger quarters and mounted the stairway leading to the promenade deck, thence to make his way forward to the ladder going down to the forward deck on which were located the anchor windlasses. The wind was of such force that he had to turn his back to the gale and descend in that manner. He could not reach either windlass because, he says, the covers were off the ventilators and the wind had rushed into the cargo holds exerting great pressure, as a result of which "hatches, hatch covers, tarpaulins, hatch boards, spare hatches, lumber, everything that was lying on deck, everything blew up and blew in my direction."

The vessel's log, written in deliberation, after the excitement of the storm had subsided, shows this attempt was an hour before the Madison broke loose at 1 o'clock. It seems difficult to believe that in a very short time a wind of such force would not have cleared out all the threatening loose articles and made possible the minute at each anchor windlass required to drop them. Probably what actually happened was that the captain's attempt to drop anchors, instead of being delayed until 12 o'clock, was really delayed until nearly 1 o'clock, because he tells us that shortly after he found he could not go through the barrage of wind blown missiles, the vessel's bow broke away from the pier and she began her drift of destruction.

The apostles are replete with conflicting testimony as to the quality of the holding ground in the slip between pier 40 and pier 41 and as to whether or not one or both anchors would have prevented the President Madison from journeying up the slip. All the witnesses were heard by the trial judge with a view to the maintenance of the Madison's burden of proof that the collisions were the inevitable result of vis major and that the ground would not have held the anchors and the steamer. Careful consideration requires us to hold that

the steamer has neither overcome the presumption in favor of the court's findings in the interlocutory decree nor maintained her burden of proof prescribed in The Louisiana, supra.

We hold that the President Madison is liable for the injury to the libelants below and proceed to examine the evidence upon which are based the findings of the amounts of the damages awarded libelants in the final decree.

*Value of the Steamer Harvester.* The American Mail Line appeals from the final decree, taking issue with the award of damages to appellee Skagit River Navigation & Trading Company for loss of the Harvester. The Harvester was a total loss. The issue on this phase of the appeal is as to the value of the Harvester immediately prior to the collision. Other items of damage, such as cargo claims, costs of salvaging surveys as well as proper offsets in the way of salvaged equipment, which was sold by the appellee subsequent to the collision, have been stipulated.

The Harvester was a wooden sternwheel vessel built in 1912, of length 152 feet, beam 32.6 feet, depth of hold 6.8 feet. She was built for a particular trade—the 75-mile run between Seattle and Mount Vernon on the Skagit River. Twelve miles of this trip were on the river, the remaining 63 being on Puget Sound. Hence it was required that the vessel be sturdy enough for the Sound, yet of small enough draft to negotiate the river. The river varies greatly in height during the year, and the Harvester was adapted to all seasons. It was kept in service all year around. It had a draft of 2 feet, this being required for the low-water seasons of the river. The beam was broad, to give a sturdiness despite the shallow draft. In addition to her particular construction, the Harvester was equipped with an elevator for loading and unloading purposes. Inasmuch as she did her own loading and unloading, not using local longshoremen, she carried a crew of about 22 for that purpose and had accommodations for them.

It appeared in evidence that no boats could be secured which would answer the purpose for which the Harvester was designed. Libelant's witnesses had endeavored to procure a vessel from the Columbia River trade, but discovered that the sternwheel steamers on the Columbia, above Portland, were not sufficiently sturdy to negotiate the waters of Puget Sound, where-

as those between Portland and Astoria were of too deep a draft for the Skagit River.

Consequently, libelant constructed, at a cost of $69,000, a new boat, the Skagit Chief, similar to the Harvester, but somewhat larger, having 100 tons greater carrying capacity. Before deciding upon the construction of a new vessel, the libelant solicited bids for the repairing of the Harvester. Four bona fide bids were submitted for rebuilding the ship from her old hull. These ranged between $42,977.50 and $51,252.

Two witnesses for libelant testified as to their opinion of what it would cost to construct a new vessel identical with the Harvester. One said $65,000, and the other estimated between $60,000 and $65,000. Evidence of what the original cost of construction had been was unavailable.

In the early part of 1934, the Harvester was considerably renovated at the Lake Union Drydocks. The keelsons were replaced, steel water tanks were substituted for wooden tanks, a new boiler foundation, guards deck planking, and hog chains, were put in, and the vessel given a general testing and overhauling. The court found that at that time she was good for upwards of fifteen years.

Also in evidence were the Harvester's gross and net earnings for the years preceding the collision. From January 1, 1931, to October 1, 1934, her average annual net earnings were $8,679.57.

Anna Grimison, president of the Skagit Company, testified that in her opinion the vessel was worth from thirty-five to forty thousand dollars at the time of the collision.

Appellant introduced experts who gave it as their opinion that the market value of the Harvester at the time of collision was between $10,000 and $13,000. Other witnesses for appellant testified that the cost of reconstructing the Harvester would be between $41,000 and $45,000. Deducting estimated depreciation from these figures, these experts fixed the value of the vessel at the time of collision at twelve or fourteen thousand dollars. The depreciation formula used by these experts was 10 per cent. of the first year, 5 per cent. for each succeeding year, based upon depreciated values. Appellant's witnesses estimated the probable future life of the Harvester, had she not been destroyed, at about eight years.

The trial court found the value of the Harvester just before she was destroyed to be $35,500. It found that there was no market value for her because of her peculiar construction. It purported to assess her worth as a "going concern." It found the cost of reconstruction to be $65,000. This figure, together with all the other evidence, resulted in the sum found to be the reasonable value.

■ Appellant attacks the court's finding and decision chiefly because of its alleged neglect of market value—that is, the price the Harvester would bring on a sale—and its adoption of "going concern value." We think no error was committed in this respect. It is undeniably true, as urged by appellant, that market value is the only permissible test, provided the boat has a ready market in which its sale price is estimable. Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 155, 45 S.Ct. 465, 69 L.Ed. 890; Alaska S. S. Co. v. Inland Nav. Co. (C.C.A. 9) 211 F. 840, 842, 846. The trial court's conclusion that the Harvester had no market value is well substantiated in the evidence. She was built especially for the Puget Sound-Skagit River course, and the testimony abundantly shows that there were no other vessels, in Seattle or on the Columbia River, which would answer the purpose. It is urged that the market value test is not whether other vessels can be purchased in the open market to replace the one which is lost, but rather whether the lost vessel could have been used in other services to a sufficient extent to find purchasers. So it is said that, although a Columbia River stern wheeler could not have been used on the Puget Sound-Skagit River route, the Harvester, nevertheless, could have been sold for use on the Columbia River.

This argument overlooks the economic reasons for the market value test and for substituting other criteria when that fails. If the Harvester had been sold for Columbia River service, she would have commanded a price measurable to vessels in that service. Her peculiarities—broad beam, exceptionally shallow draft, and other special features—would not have been reflected in the price commanded by the vessel in a market where these features were unnecessary and superfluous. Such a price could not give the owner, who needs these special features for his trade, the value of what he had lost.

■ Failing market value, a court of admiralty may estimate the worth of a lost ship by all relevant evidence, including original cost less depreciation, cost of reconstruction less depreciation, the earnings of the vessel, her condition at the time of loss, her probable life expectancy before she was lost, and prior statements of the owner as to her value, for tax or other purposes. Standard Oil Co. v. Southern Pacific Co., supra; Alaska S. S. Co. v. Inland Nav. Co., supra; The Granite State, 70 U. S. 310, 314, 18 L.Ed. 179; La Normandie (C.C.A.-2) 58 F. 427; The I. C. White (C.C.A.-4) 295 F. 593, 595; The Hisko (C.C.A.-2) 54 F.(2d) 540, 541. The value of the Harvester, measured by these tests, is, presumably, what the District Court had in mind when it used the term "going concern" value.

According to the court's finding the presumption which is its due when factual conclusions have been reached upon conflicting oral testimony, we are unable to see any error. There is ample evidence supporting the finding that the cost of reconstructing the vessel would be $65,000. The vessel was in first-class condition, having very shortly before the collision been extensively overhauled. The court found, with ample supporting evidence, that her probable future life would have been upwards of fifteen years. She had been earning $8,679.57 annually, and the Skagit River trade was on the increase. In the light of all this evidence, the court was fully justified in finding $33,500 to be her reasonable value at the time of the collision.

All items of damage other than the loss of the Harvester were stipulated between all parties on January 28, 1936, the date at which the cause came on for hearing for the assessment of damages. These sums include cargo damage, repairs, and replacements, salvage, service, demurrage, and miscellaneous items. The court awarded the amounts stipulated, but allowed interest only from January 28, 1936, the date the claims were liquidated by stipulation. On the value of the Harvester interest was allowed from the date of the final decree.

All libelants took cross-appeals from the decree assigning error to the refusal to allow interest on the lost items from the date of the collision and on the other items from the time the expenses thereon were incurred.

■ *Parties injured by a tortious collision are entitled to just compensation for the wrong done them. This includes interest from the date of the sinking and loss of cargo and from the date of necessary repairs, etc.*

■ *The trial judge's discretion to deny such just compensation is based upon peculiar facts of a case, showing that the injured parties have deprived themselves of such compensation.*

■ *Admiralty uniformity requires that just compensation should not vary from port to port, by the varying state laws as to what constitutes such compensation.*

The total loss of a vessel cannot be fully compensated by payment years after of no more than her value at her sinking or destruction. The owner has neither the use of the vessel nor her money equivalent during this period, and interest on her then value is necessary for just compensation. So also with reference to moneys expended in repairs or replacements. Interest here, as in ordinary business transactions, is the usual and ordinary method of making full restitution. The District Judge's discretion should be exercised to accomplish such restitution, unless peculiar facts deprive libelants of their right to just compensation for the wrong done them by the Madison. Unless such facts exist, to deny interest from the date of destruction is to allow the tort-feasor the use of moneys belonging, in common parlance, to the party he has injured.

The Supreme Court has reaffirmed the principle in the collision case of the Cushing and the Proteus. In that case the Commissioner of the District Court found the value of the Proteus on August 19, 1918, the date of her sinking and total loss, with interest from that date. The Cushing (D. C.) 285 F. 617, 622.

The District Court confirmed the Commissioner's allowance and gave its decree for $750,000 and interest from the date of sinking. The Circuit Court of Appeals (292 F. 560) increased the value of the Proteus on that date and awarded $1,225,-000, and interest from sinking. The Supreme Court affirmed the decree of the Circuit Court of Appeals, holding:

"Restitutio in integrum is the leading maxim applied by admiralty courts to ascertain damages resulting from a collision (The Baltimore, supra [8 Wall. 377], 385 [19 L.Ed. 463]), and, on the same principle, value is the measure of compensation in case of total loss." Standard Oil Co. v.

Southern Pac. Co., 268 U.S. 146, 158, 45 S.Ct. 465, 69 L.Ed. 890.

"It is fundamental in the law of damages that the injured party is entitled to compensation for the loss sustained. Where property is destroyed by wrongful act, the owner is entitled to its money equivalent, *and thereby to be put in as good position pecuniarily as if his property had not been destroyed.* In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, *at the time of destruction.* The Baltimore, 8 Wall. 377, 385, 19 L.Ed. 463. * * * Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934." (Italics supplied.) Standard Oil Co. v. So. Pacific Co., 268 U.S. 146, 148, 155, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890.

The Brooks-Scanlon Case concerned the taking of a contract for an incompleted .vessel, and on the page cited (page 123 of 265 U.S., 44 S.Ct. 471, 474, 68 L.Ed. 934) the Supreme Court held: "And, if the taking precedes the payment of compensation, the owner is entitled to such addition to the value at the time of the taking as will produce the full equivalent of such value paid contemporaneously. *Interest at a proper rate is a good measure of the amount to be added.* Seaboard Air Line Ry. Co. v. United States, supra [261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664]. United States v. Benedict, 261 U.S. 294, 298, 43 S.Ct. 357, 67 L.Ed. 662; United States v. Brown, 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. [171]." (Italics supplied.) Brooks-Scanlon Corp. v. U. S., 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934.

In this the court followed Seaboard Air Line Ry. v. U. S., 261 U.S. 299, citing to page 306, 43 S.Ct. 354, 356, 67 L.Ed. 664, where the court held: "The requirement that 'just compensation' shall be paid is comprehensive and includes all elements and no specific command to include interest is necessary when interest or its equiv-, alent is a part of such compensation. Where the United States condemns· and takes possession of land before ascertaining or paying compensation, the owner is not limited to the value of the property at the time of the taking; he *is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking. Interest at a proper rate is a good measure by which to ascertain the amount so to be added.*" (Italics supplied.)

Interest has been allowed by the Supreme Court for maritime torts from a very early date. In The Amiable Nancy, 3 Wheat. 546, 4 L.Ed. 456, where the tortfeasor was a privateer, the court (Justice Story) decreed liability for the moneys expended in securing her release from a prize court and awarded interest on all items of such expenditure from the date of their payment; the court's order being: "To the decree of the circuit court there are, consequently, to be added the following sums, viz.: For expenses and costs of court at Antigua, $542.21. The loss on the exchange to pay that sum, (say) $188. The short allowance of expenses, $44. In the whole, amounting to the sum of $774.21, on which interest, at the rate of 6 per cent. is to be allowed from the time of payment up to the time of this judgment. And the decrêe of the circuit court is to be reformed accordingly." The Amiable Nancy, 3 Wheat. 546, 561, 4 L.Ed. 456, 462.

The controlling authority in cases of collision is The Umbria, 166 U.S. 404, 421, 17 S.Ct. 610, 617, 41 L.Ed. 1053, where, in determining the damages in the sinking of the Iberia, the Supreme Court, in denying recovery for an unperformed charter, held: "There is nothing in the peculiar facts of the case to take it out of the general rule that in cases of total loss by collision damages are limited to the value of the vessel, with interest thereon, and the net freight pending at the time of the collision."

This upheld the report of the Commissioner in the District Court, who "declined to allow the amount of freight that would have been earned by the steamer under the charter from New York to Cadiz, upon the ground that she became a total loss by means of the collision in question; and in such case the liability of the offending party ends with payment of total loss, *with interest from the time of loss.*" The Iberia (D.C.) 46 F. 301, 302.

In recognizing that interest is necessary to make "just compensation" for the loss of a vessel or the repairs, salvage expenditures, and the like, caused by the tort of the colliding offender—that is, to make the restitutio in integrum of the Cushing-Proteus Case, supra—this court is in accord with the holdings in the First, Second, Fifth, and Sixth Circuits and District Courts in the Third and Fourth. These are maritime circuits in which nearly all the admiralty causes are litigated. Eastern S.

S. Co. v. Dock Co. (C.C.A.-1) 256 F. 497; In re Hibbard (C.C.A.-2) 27 F.(2d) 686; The Manhattan (D.C.Pa.) 10 F.Supp. 45, 49; The Sovereign of the Seas (D.C.Va.) 139 F. 812; The Natchez (C.C.A.-5) 78 F. 183, 186; The William Chisholm (C.C.A.-6) 153 F. 704, 714.

Under The Umbria rule interest may be refused under the "peculiar facts" of the case, such as extraordinary delay in commencing or prosecution of the libel. This is within the discretion of the court, but the discretion must be exercised with a view to the right to interest unless the circumstances are exceptional. Examples of cases where the successful party deprived himself of interest are The Express (C.C.A.-2) 59 F. 476, and the S. V. Luckenbach (C.C.A.-2) 197 F. 893 (where prevailing party did not increase his award or decrease liability); The Arpillao (C.C.A.-2) 270 F. 426 (delay in prosecuting appeal); Penn. Ry. v. Downer (C.C.A.-2) 11 F.(2d) 466 (delay in prosecution); The North America (D.C.) 24 F.(2d) 846 (failure to press laggard Commissioner by court order); The William Chisholm (C.C.A.-6) 153 F. 704, 714 (delay in taking depositions); The Sovereign of the Seas (D.C. Pa.) 139 F. 812, 815.

▉ The fact that interest would not be allowed in the state courts of Washington for total loss by collision until after judgment is not such an exceptional fact. This is a collision case of maritime cognizance, because on navigable waters, and the fact that the vessels were not engaged in interstate or foreign commerce is irrelevant. The Genessee Chief, 12 How. 443, 13 L.Ed. 1058.

▉ The maritime law concerning "restitutio in integrum" must be uniform and not vary with the local laws of different ports. While this may warrant the choice of a local rate of interest, it cannot destroy the uniformity of the fundamental law of restitution in admiralty. Chelentis v. Luckenbach S. S. Co., 247 U.S. 372, 382, 38 S.Ct. 501, 62 L.Ed. 1171; Southern Pac. Co. v. Jensen, 244 U.S. 205, 216, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas. 1917E, 900.

▉ Prior to the rule requiring findings in admiralty cases, we *usually assumed* that the refusal of interest was a justifiable exercise of the court's discretion. However, we have held that that discretion is reviewable and considered the proper grounds of

review in The Rickmers (C.C.A.-9) 142 F. 305, 314, as follows: "The allowance of interest is within the discretion of the court. Hemmenway v. Fisher, 20 How. [255], 258, 15 L.Ed. 799; The America, Fed.Cas.No. 285, 11 Blatchf. 485. The collision occurred on the 25th day of December, 1901. The libel was filed January 28, 1902. The court below allowed interest at the rate of 6 per cent. per annum upon the sum of $18,680 from the 25th day of March, 1902. This latter date appears to have been fixed for the commencement of interest because at that date the repairs on the schooner had been completed, and the schooner had been reloaded to the extent that she was loaded at the time of the collision. The decree was not entered in favor of the libelant until November 7, 1904. This delay in the proceedings in court does not appear to be chargeable to the libelant. The allowance of interest was, therefore, under all the circumstances, *an element of compensation*, and not punitive damages, and was *properly allowed* upon the amount expended for the repair of the vessel, but should not be allowed upon the $5,000 claimed as permanent injury, which we have determined was not established." (Italics supplied.)

To the suggestion that interest between the dates of the collision and the decree was allowed in the total sum of $33,500, it is sufficient to cite the finding and conclusion of law of the District Court.

The finding is: "Having considered all the relevant facts as shown by the evidence, the Court finds that the value of the SS 'Harvester' on October 21, 1934, *immediately prior to said collision with* the SS 'President Madison' was $33,500.00." (Italics supplied.)

The conclusion of law and award of damages is: "1. Value of the vessel, $33,500.00 [Oct. 21, 1934], less value of salvage, $2656.00, or $30,844.00, with interest thereon at the rate of 6% per annum *from date [April 15, 1936] of* the decree herein." (Italics supplied.)

▉ Since findings are now required, there should have been a finding of the "peculiar facts" causing the denial of interest from the date of the collision and on the other items. The record here does not show such facts.

▉ Appellant American Mail Line requests this court in its mandate to exclude interest from April 15, 1936, the date of the final decree, citing The Express (C.C.A.-

848

2) 59 F. 476; and the S. V. Luckenbach (C. C.A.-2) 197 F. 893. The theory of these cases appears to be that when a victorious party in admiralty takes an appeal, he is not entitled to interest pending the determination of the appeal, inasmuch as he has, by appealing, put it out of the power of the other party to pay the amount awarded. We do not think it reasonable to apply that rule where the losing party appeals and the winning parties take cross-appeals only on the question of the proper amount of interest to be awarded.

The decree is affirmed as to the fault of the President Madison and her owners in causing the collision and on the damage and interest other than interest prior to the decree. It is ordered amended to allow interest on the value of the Harvester and property damage and loss from October 21, 1934, to April 15, 1936, and upon expenditures from the date when made to the date of the decree.